# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2910

_____

Norman Brown; Ralph McElroy; Sidney C. Roberts; Theron Roland, also known as Theron "Pete" Roland,

*Plaintiffs - Appellees*,

v.

Anne L. Precythe, in her official capacity, Director of Missouri Department of Corrections; Don Phillips, in his official capacity, Chairman of the Missouri Board of Probation and Parole; Bryan Atkins, in his official capacity, Member of the Missouri Board of Probation and Parole; Martin Rucker, in his official capacity, Member of the Missouri Board of Probation and Parole; Paul Fitzwater, in his official capacity, Member of the Missouri Board of Probation and Parole; Brian Munzlinger, in his official capacity, Member of the Missouri Board of Probation and Parole; Jennifer Zamkus, in her official capacity, Member of the Missouri Board of Probation and Parole; Jamilah Nasheed, in her official capacity, Member of the Missouri Board of Probation and Parole,[1]

*Defendants - Appellants*.

------------------------------

Current and Former State Prosecutors, State Attorneys General, DOJ Officials, U.S. Attorneys, and Former Corrections Directors; NAACP Legal Defense and Educational Fund, Inc.; Juvenile Law Center; Children and Family Justice Center; Fred T. Korematsu Center for Law and Equality; American Academy of Child and

---

[1]Don Phillips, Bryan Atkins, Paul Fitzwater, Brian Munzlinger, and Jamilah Nasheed are substituted for their predecessors under Federal Rule of Appellate Procedure 43(c)(2).

Adolescent Psychiatry; Individual Mental Health Professionals; The Campaign for the Fair Sentencing of Youth; National Association for Public Defense

*Amici on Behalf of Appellee(s).*

_____

No. 19-3019
_____

Norman Brown; Ralph McElroy; Sidney C. Roberts; Theron Roland, also known as Theron "Pete" Roland,

*Plaintiffs - Appellants*,

v.

Anne L. Precythe, in her official capacity, Director of Missouri Department of Corrections; Don Phillips, in his official capacity, Chairman of the Missouri Board of Probation and Parole; Bryan Atkins, in his official capacity, Member of the Missouri Board of Probation and Parole; Martin Rucker, in his official capacity, Member of the Missouri Board of Probation and Parole; Paul Fitzwater, in his official capacity, Member of the Missouri Board of Probation and Parole; Brian Munzlinger, in his official capacity, Member of the Missouri Board of Probation and Parole; Jennifer Zamkus, in her official capacity, Member of the Missouri Board of Probation and Parole; Jamilah Nasheed, in her official capacity, Member of the Missouri Board of Probation and Parole,

*Defendants - Appellees*.

------------------------------

Children and Family Justice Center; Current and Former State Prosecutors, State Attorneys General, DOJ Officials, U.S. Attorneys, and Former Corrections

Directors; Fred T. Korematsu Center for Law and Equality; Juvenile Law Center; The Campaign for the Fair Sentencing of Youth; National Association for Public Defense

*Amici on Behalf of Appellant(s).*

_____

Appeals from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: January 11, 2022
Filed: August 30, 2022

_____

Before SMITH, Chief Judge, LOKEN, ARNOLD, COLLOTON, GRUENDER, BENTON, SHEPHERD, KELLY, ERICKSON, STRAS, and KOBES, Circuit Judges, En Banc.

_____

COLLOTON, Circuit Judge.

In 2016, in light of Supreme Court decisions interpreting the Eighth Amendment's proscription on cruel and unusual punishment, the Missouri legislature modified state law regarding parole. The legislature enacted a statute permitting a juvenile homicide offender to petition for parole if he had been sentenced to mandatory life imprisonment without parole. A class of inmates who were juvenile offenders sued the state officials responsible for administering the parole process. The inmates alleged that the policies and practices of the parole officials violated their rights to be free from cruel and unusual punishment and to due process of law under the federal and Missouri constitutions. The district court determined that the parole review practices were constitutionally deficient, and ordered the State to implement an elaborate remedial plan. The State appeals, and we conclude that there is no constitutional violation. We therefore reverse the judgment of the district court.

-3-

I.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that the Eighth Amendment, as applied to the States through the Fourteenth Amendment, forbids the mandatory imposition of a sentence of life without parole for a juvenile homicide offender. *Id.* at 479. The Court relied on a line of cases establishing "that children are constitutionally different from adults for purposes of sentencing," and that some punishments will therefore be cruel and unusual when imposed on juveniles without opportunity for a sentencing judge "to consider the mitigating qualities of youth." *Id.* at 471, 476 (internal quotation omitted). Four years later, in *Montgomery v. Louisiana*, 577 U.S. 190 (2016), the Court held that the rule announced in *Miller* applies retroactively in cases on collateral review. *Id.* at 212. The Court explained, however, that *Miller*'s retroactive effect did not mean that States must "relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole." *Id.* Rather, a State could "remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole." *Id.*

Missouri responded to *Montgomery* by enacting Mo. Rev. Stat. § 558.047. This statute permits a juvenile homicide offender who was sentenced to mandatory life without parole to petition for parole after serving twenty-five years of his sentence. Mo. Rev. Stat. § 558.047.1(1). If an offender files a petition, then the Missouri Board of Probation and Parole must hold a hearing to determine whether he will be granted parole. *Id.* § 558.047.4. The offender is entitled to invite a delegate (who may be an attorney) to speak in support of the offender at the hearing. In Missouri, a typical parole hearing lasts no more than thirty minutes, but the average hearing for a juvenile homicide offender is forty-five minutes long. The statute directs the board to consider fifteen factors in making its parole decision. These factors bear generally on the inmate's youthful judgment, subsequent emotional and intellectual development, and efforts toward rehabilitation. *Id.* §§ 565.033.2, 558.047.5.

Norman Brown, Ralph McElroy, Sidney Roberts, and Theron Roland are serving prison sentences in Missouri for first-degree homicides committed as juveniles. Each was sentenced before *Miller* to a mandatory term of imprisonment of life without the possibility of parole. Each petitioned for parole under § 558.047.1, the statute enacted after *Montgomery*. The parole board convened a hearing for each inmate and denied the petitions. The board scheduled each inmate for reconsideration within five years.

The inmates, on behalf of themselves and a class of similarly situated inmates, sued the Director of the Missouri Department of Corrections and members of the parole board in their official capacities under 42 U.S.C. § 1983. The inmates alleged a series of grievances: that they were unable to review their parole files in advance of their hearings before the parole board; that they were permitted only one delegate to advocate on their behalf at the hearings; that the delegate was limited to discussing an inmate's plans to transition back into the community; that victims and their advocates who spoke at the hearings did not face similar limitations; that the board communicated its decisions via "barebones, boilerplate" forms; that the board's decisions rested primarily on the seriousness of an inmate's offense, rather than an evaluation of an inmate's maturity or rehabilitation; and that the State declined to provide the inmates with state-funded counsel at the parole hearings. The inmates asserted that the collective effect of these practices constituted cruel and unusual punishment and denied them due process of law. They also sought a declaratory judgment that the board did not adequately consider the factors in Mo. Rev. Stat. § 558.047.5.

After discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment for the State on the inmates' statutory claim. The court concluded that the inmates had not made a *prima facie* showing that the parole board failed to consider the factors enumerated in § 558.047.5. But the court granted summary judgment for the inmates on the constitutional claims. The court

understood *Miller* and *Montgomery* to require that juvenile offenders be provided "a meaningful and realistic opportunity to secure release upon demonstrated maturity and rehabilitation." The court then reasoned that the board had failed to provide this "meaningful opportunity" in its parole proceedings, and that its failure to do so violated the inmates' rights to due process and to be free from cruel and unusual punishment.

The district court next directed the State to propose a plan that would remedy the purported constitutional violation. After an evidentiary hearing, the court ordered the State to implement a twenty-three-point remedial plan. The plan instituted mandatory training for board members, increased the number of delegates that an inmate may bring to a parole hearing, allowed an inmate to bring an expert witness whose presentation cannot "be limited in any fashion," and required parole board members "to document the reasons" for voting to deny parole.[2]

---

[2]The procedures dictated by the district court include, among others, that (a) inmates may bring four delegates to each parole hearing, (b) the parole board may not deny parole based solely on the seriousness of the homicide offense, (c) all inmates who were denied parole must be granted new hearings within ninety days of the conclusion of this case, (d) all members of the parole board and participating staff must receive "training on the requirements of *Miller*, *Montgomery*, and *Graham*," (e) the State must provide an updated parole file (including a privilege log) to each inmate at least six months before any parole hearing, (f) the State must use a "pre-hearing interview form" that includes a quotation from *Miller* and "spaces for the Institutional Parole Officer to note whether any rehabilitative or training programs were unavailable to the inmate and why," (g) after reaching a decision, the members of the parole board must "document the reasons for their votes, as well as any evidence indicating unsuitability for parole," (h) the parole board "shall not use any risk assessment tool unless it has been developed to address inmates affected by *Montgomery* or *Miller*," (i) if a victim or victim's representative chooses to speak to the parole board outside the presence of the homicide offender, the State must either provide state-funded counsel to the inmate, provide the inmate and his delegates a live video or audio feed of the victim's testimony, or provide the inmate with a transcript of the victim's statements and an opportunity to respond, (j) inmates have

On appeal, the State asserts that the district court erred by concluding that the State's parole procedures violated the inmates' constitutional rights. The inmates cross-appeal and argue that the district court also should have required state-funded counsel for inmates at parole hearings as a remedy. We review the district court's grant of summary judgment *de novo*.

II.

The parties initially disagree about whether the inmates' claims are cognizable under 42 U.S.C. § 1983, or whether the inmates must bring their claims in a petition for writ of habeas corpus under 28 U.S.C. § 2254. *See Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973). Given our conclusions below, we need not resolve this question. We will assume without deciding that the inmates' claims were properly brought under § 1983, and proceed to address the merits. *See Dist. Att'y's Off. for the Third Jud. Dist. v. Osborne*, 557 U.S. 52, 67 (2009). To prevail under § 1983, the inmates must show that the defendants deprived them of a federal right under the Eighth Amendment or the Due Process Clause.[3]

---

a right to counsel at their own expense at a pre-hearing interview with parole board staff, and (k) an inmate may bring to any parole hearing an expert witness whose presentation "shall not be limited in any fashion," (l) the State must provide an inmate with a recording of his parole hearing within two weeks after the hearing, and (m) a parole officer must assist an inmate "in retrieving various relevant records without waiting for the [inmate] to become eligible to apply for parole release." R. Doc. 179, at 13-23.

[3]Because the relevant Missouri constitutional provisions are coterminous with their federal counterparts, we consider the inmates' claims under state law together with the federal claims. *See State v. Wood*, 580 S.W.3d 566, 588 (Mo. 2019) (cruel and unusual punishment); *New Garden Restaurant, Inc. v. Dir. of Revenue*, 471 S.W.3d 314, 316 n.2 (Mo. 2015) (due process).

The inmates claim that the State's parole procedures violate the Eighth Amendment's prohibition on cruel and unusual punishment. The thrust of this claim is that Missouri's parole-review regime for juvenile homicide offenders does not comply with the Supreme Court's dictates in *Miller* and *Montgomery*.

The Eighth Amendment claim, however, collides with the express language of *Montgomery*. *Montgomery* said that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." 577 U.S. at 212. The Court then cited with approval a Wyoming statute that makes such offenders eligible for parole consideration after serving twenty-five years. *Id.* (citing Wyo. Stat. Ann. § 6-10-301(c) (2013)). Missouri did what *Montgomery* prescribed: it provided by statute that a juvenile homicide offender who was originally sentenced to mandatory life without parole may petition for parole after serving twenty-five years of his sentence. Mo. Rev. Stat. § 558.047.1(1); *see Hicklin v. Schmitt*, 613 S.W.3d 780, 787-89 (Mo. 2020). In a case decided after the district court's decision, the Supreme Court emphasized that rather than make inferences from the Court's various decisions about sentencing of juvenile offenders, we should follow "what *Miller* and *Montgomery* said—that is, their explicit language addressing the precise question before us." *Jones v. Mississippi*, 141 S. Ct. 1307, 1321-22 (2021). That explicit language calls for rejecting the Eighth Amendment claim here.

The inmates assert that Missouri's parole regime is nonetheless constitutionally deficient because it does not provide juvenile homicide offenders with "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." This language is drawn from a decision in which the Supreme Court held that a State may not sentence a juvenile *non*-homicide offender to life without the possibility of parole, and must provide the offender "some meaningful opportunity to obtain release." *Graham v. Florida*, 560 U.S. 48, 75 (2010). The Court in *Miller* adverted to the *Graham* decision in concluding that the Eighth

-8-

Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile homicide offenders. 567 U.S. at 479. The inmates argue that to comply with *Miller* and *Montgomery*, and to afford a "meaningful opportunity" for release, the parole board must implement procedures that account for the so-called "*Miller* factors" that guide a judge's decision at sentencing. These factors include an offender's level of maturity, his family and home environment, the circumstances of the offense, and the possibility for rehabilitation. *See Miller*, 567 U.S. at 477-78.

The *Miller* factors, however, apply as a constitutional matter only to a judge's decision at sentencing whether to impose a term of life imprisonment without parole for a juvenile homicide offender. *Montgomery*, 577 U.S. at 209-10. *Miller* held that consideration of these factors was necessary at sentencing, because the Eighth Amendment forbids a mandatory sentence of life without parole for juvenile offenders. 567 U.S. at 479. By operation of Missouri law, the inmates here were resentenced to life *with* the possibility of parole. *Hicklin*, 613 S.W.3d at 787-88. *Miller* and *Montgomery* did not purport to go further and direct federal courts to scrutinize in a civil rights action whether a State's parole procedures afford "some meaningful opportunity" for release of a juvenile homicide offender. As the Fourth Circuit observed, accepting the inmates' argument here would require this court to conclude (1) that the Supreme Court's juvenile-specific Eighth Amendment protections extend to juvenile homicide offenders sentenced to life *with* the possibility of parole, and (2) that those protections extend beyond sentencing proceedings. *Bowling v. Dir., Va. Dep't of Corr.*, 920 F.3d 192, 197 (4th Cir. 2019). Like the Fourth Circuit, we decline to go that far.

But even if we go further and assume for the sake of analysis that the Eighth Amendment applies to parole proceedings for juvenile homicide offenders, there is no violation here. The record shows that the Missouri parole process is not a sham. Of the twenty-eight juvenile homicide offenders considered for parole under Mo.

-9-

Rev. Stat. § 558.047, four offenders were scheduled for release after their *first* parole hearing. The others were scheduled for reconsideration within five years.

The inmates are eligible for parole after twenty-five years—at age forty-two for an offender who was sentenced for murder at age seventeen. Missouri law requires the parole board to consider, among other factors, the following: (1) the degree of the defendant's culpability in light of his age and role in the offense, (2) the defendant's age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense, (3) the defendant's background, including his family, home, and community environment, (4) the likelihood for rehabilitation, (5) the effect of familial pressure or peer pressure on the defendant's actions, (6) the effect of characteristics attributable to the defendant's youth on the defendant's judgment, (7) efforts made toward rehabilitation since the offense occurred, (8) subsequent growth and increased maturity of the person since the offense occurred, (9) evidence that the person has accepted accountability for the offense, (10) the person's institutional record during incarceration, and (11) whether the person remains the same risk to society as he did at the time of initial sentencing. Mo. Rev. Stat. §§ 565.033.2, 558.047.5. The Supreme Court of Missouri, in a decision that was not available to the district court, emphasized that the parole board must consider these factors (which include the *Miller* factors) in determining whether to grant parole to a juvenile homicide offender. *Hicklin*, 613 S.W.3d at 788-89.

Consideration of these factors provides "some meaningful opportunity" for an offender to obtain release based on demonstrated maturity and rehabilitation. Missouri provides offenders with advance notice of their parole review, an opportunity to be heard (including through a delegate who may be a lawyer), and an opportunity to submit documents and letters of support. Inmates are interviewed by parole staff before the hearing, and the parole board considers a report from staff that addresses readiness for parole. These reports address maturity and rehabilitation. *See* R. Doc. 138-16, at 13 (SA 605); R. Doc. 138-19, at 11 (SA 696); R. Doc. 138-20, at

12 (SA 708); R. Doc. 138-21, at 9 (SA 717). At a hearing, the inmate and his delegate are permitted to address issues related to the inmate's transition to the community, including "offender growth," a topic that readily allows for information about the inmate's maturity and rehabilitation. That the parole board may hear more from victims and law enforcement, and may consider the seriousness of the inmate's homicide offense, does not mean that there is no "meaningful opportunity" for parole. These other matters are appropriate for consideration in a parole proceeding, and the State is not required to adopt procedures that are more advantageous to juvenile homicide offenders seeking release from custody.

The inmates object that the form used by the parole board to communicate the denial of a petition does not encompass all of the statutory factors, and lists only two reasons for a denial: (1) that release "would depreciate the seriousness of the present offense," or (2) that there is no apparent "reasonable probability at this time that the offender would live and remain at liberty without again violating the law." But the district court determined that the inmates failed to make a *prima facie* showing that the parole board fails to consider the statutory factors, and the inmates do not appeal the dismissal of that claim. In any event, the form's second reason for denial—no reasonable probability that the offender would refrain from violating the law—naturally encompasses whether the inmate has matured and rehabilitated to the extent that he is an appropriate candidate for parole. There is nothing impermissible about also considering the seriousness of the inmate's homicide offense in the parole determination. An offender who committed a murder that was especially heinous, atrocious, or cruel could reasonably warrant different consideration, and a different timeline for release, than one whose offense was less aggravated.

The district court concluded on summary judgment that "[i]n practice, . . . delegates are directed to discuss only inmates' home plans." But the court cited only one parole hearing, during which a panel member told the inmate's delegate (his sister) that "really what I need to know from you is what kind of support you have for

-11-

him upon release," and that the board was "not going to retry the case." R. Doc. 139-32, at 20, 45. The sister was presented as the inmate's "home plan" if he were released, so the parole board understandably wanted to know about the support that she would provide. The board reasonably declined to retry the underlying murder case. This case-specific direction to a delegate in one particular hearing is insufficient support for a conclusion that Missouri undisputedly forbids delegates as a general matter to discuss maturity and rehabilitation. Nor does it say anything about what inmates themselves may discuss when speaking to "offender growth."

In the very parole hearing cited, the inmate discussed maturity and rehabilitation at length. R. Doc. 139-32, at 37-43. He spoke of his work in prison, his relationship with his family, his pride in maintaining good health, his decision to "follow the rules" and "stay out of trouble," and his choice "to hang around with people with like-minded interest." A panel member asked what made him change, and the inmate described "a gradual process of maturity" that had a lot to do with his family. When another panel member asked how he evolved from a youthful "knucklehead" to a 46-year-old inmate with virtually no disciplinary record, the inmate said: "I'm still living my life. I feel like my life's still worth something even if I have to do the rest of my life in here." The inmate explained that he had earned his GED and completed other educational programs. A panel member asked about job skills that could facilitate obtaining employment upon release, and the inmate said that he had worked in a furniture factory and in food service as a cook, and that he currently worked as a porter at the correctional center. This was not a parole proceeding that prohibited the inmate from discussing maturity and rehabilitation.

In another parole hearing for one of the plaintiffs, a panel member invited the inmate to discuss why he was no longer "the same person" who committed the homicide offense. The inmate explained that he had "grown into a responsible, mature adult who has the thinking ability to not only know right from wrong but do right from wrong." He described his understanding of "what it means to love, to not

-12-

hurt people," and said that he would "no longer ever, ever be that immature, vulnerable little boy" who committed the homicide. The inmate explained that he grew up "in a crime-infested neighborhood," with a mother who was "never there" and a stepfather who was an alcoholic. But he told the panel: "I came to this prison at the right time because it gave me room to grow as a man." He explained that there were many programs available to him at prison, and that he "took full advantage of those programs." He remarked that he "started just changing [his] life," "started believing in God more," and "started just wanting to be a better person." While he was "ashamed" of his actions as a "little boy," he was no longer "the same person" who committed the homicide and loved "the man [he had] become." R. Doc. 134-15, at 35-46. Again, there was no prohibition on discussing maturity and rehabilitation.

In that proceeding, the inmate's delegate—after stating that the inmate had "really presented things as well as they could be presented"—also discussed maturity and rehabilitation. R. Doc. 134-15, at 48-50. She cited the inmate's remorse. She explained that the inmate's upbringing in "deep poverty" and "deep neglect" allowed an adult offender to take the inmate "under his wing" and deploy a "very sick ruse" to involve the inmate in a robbery and homicide. The delegate said that she had worked with the inmate for five years, and that the inmate "today is not that kid" who committed the homicide. The delegate assured the board that she and her colleagues would provide "holistic support"—including assistance with a "business plan" and "collateral consequences"—if the inmate were released. She explained that the inmate "did not have that kind of support growing up," and remarked that his family would be there for him as well. The delegate was not foreclosed from discussing the inmate's disadvantaged background and his growth as an adult.

A delegate in yet another hearing described in detail the inmate's "tumultuous upbringing" in a "broken, abusive home." The delegate told the parole board that the inmate had "matured immensely from the angry young man he was when he came" to prison. She said that the inmate had learned "to talk out his problems and resolve

-13-

his problems with intellect," that he sought "advice from other people," and that he was "no longer stubborn and selfish." The delegate explained that the inmate had worked as a clerk in the prison law library, and had "taken on personal development" through reading the Bible, newspapers, and magazines. R. Doc. 134-16, at 33-37. Again, consistent with procedures allowing a delegate to address "offender growth," the delegate was free to discuss abuse suffered by the inmate leading up to his homicide offense, along with the inmate's increased maturity and efforts at rehabilitation as an adult.

The record shows that there is no undisputed practice in Missouri that directs an inmate's delegate at a parole hearing to discuss only an inmate's home plan. The record also demonstrates that no rule or practice forbids an inmate himself to address his maturity and rehabilitation. The State correctly contends, with ample support in the record, that Missouri inmates at parole hearings were allowed "to provide information that could help convince the Board they were ready for parole," and that inmates "have the opportunity to show the Board that they have changed and to be considered for release."

We also conclude that there is no constitutional flaw in the parole board's manner of recording its decisions. Even when a state sentencing judge determines to sentence a juvenile homicide offender to life *without* parole, the Eighth Amendment does not require the judge to make a factual finding of permanent incorrigibility. *Jones*, 141 S. Ct. at 1318-19. It is assumed that the judge will consider the defendant's youth, and any federal requirement to make specific findings would be "intruding more than necessary" upon the States. *Id.* at 1321. The Eighth Amendment likewise does not justify a federal injunction requiring members of a state parole board "to document the reasons for their votes" to deny a periodic request for parole, and to specify "any evidence indicating unsuitability for parole."

-14-

In sum, the Supreme Court's juvenile-specific jurisprudence under the Eighth Amendment does not warrant declaring a constitutional violation and imposing on the State the elaborate set of parole procedures endorsed by the district court. A requirement to allow "some meaningful opportunity" for release, even if applicable to these juvenile homicide offenders, is satisfied here. The juvenile homicide offenders in Missouri received more process than offenders under the regular parole process: they presented more documentary evidence than adult offenders, received longer hearings than the average parole hearing, and were entitled to consideration of statutory factors that apply only to juveniles who were formerly sentenced to life without parole. Of course, a "meaningful opportunity" does not imply that every juvenile homicide offender must be released immediately upon eligibility for parole. We do not believe the Court intended through its decisions in *Graham*, *Miller*, and *Montgomery* to judicialize the parole process in the manner urged by the inmates.

*

As a separate claim, the inmates assert that the State's parole review procedures deprived them of liberty without due process of law in violation of the Fourteenth Amendment. The district court ruled that its analysis of *Miller* and *Montgomery* applied "equally" under the Due Process Clause. To invoke procedural due process protections, however, a plaintiff must have an interest in liberty at stake. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569-72 (1972). The inmates have no liberty interest in release from prison before expiration of their valid sentences. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *Gale v. Moore*, 763 F.2d 341, 343 (8th Cir. 1985) (per curiam). Instead, they claim a liberty interest in "meaningful parole review." But the Due Process Clause requires a State to afford procedures only "to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 & n.12 (1983). It does not create a protected interest in the state procedures themselves. *Id.* Without a cognizable liberty interest, the inmates' due process claim necessarily fails.

-15-

* * *

For these reasons, we reverse the judgment of the district court, vacate the injunction, and remand with directions to enter judgment for the defendants. The inmates' motion to strike portions of the State's reply brief is denied. The inmates' cross-appeal is dismissed as moot.

KELLY, Circuit Judge, with whom SMITH, Chief Judge, and ARNOLD, Circuit Judge, join, dissenting.

Over the past two decades, the Supreme Court has reaffirmed time and again that "children are constitutionally different from adults for purposes of sentencing." Miller, 567 U.S. at 471. Juvenile offenders, with their "transient rashness, proclivity for risk, and inability to assess consequences," id. at 472, are in the eyes of the Constitution less morally culpable and more capable of reforming their deficiencies than adult offenders, see id. The Supreme Court relied on this now-familiar concept—that children are different for sentencing purposes—in Miller when it held the Eighth Amendment bars mandatory sentences of life without parole for juvenile homicide offenders, id. at 479, and again in Montgomery when it gave retroactive effect to Miller's holding, 577 U.S. at 206. Together, these cases require states to afford a meaningful opportunity for release "to those who demonstrate the truth of Miller's central intuition—that children who commit even heinous crimes are capable of change." Id. at 212; see also Miller, 567 U.S. at 479 ("'A State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" (quoting Graham, 560 U.S. at 75)).

Plaintiffs are a class of Missouri inmates who were sentenced to mandatory life without parole for juvenile homicide offenses. After Montgomery, Missouri enacted SB 590 in an effort to remedy Plaintiffs' unconstitutional sentences en masse. See

-16-

Mo. Rev. Stat. § 558.047.1. The question is whether the parole review process provided under SB 590 lives up to the promise of <u>Miller</u> and <u>Montgomery</u>. The record shows that it does not.

The court first reasons that Plaintiffs' Eighth Amendment challenge fails at the outset because SB 590 allows for Plaintiffs to petition for parole, a potential remedy to <u>Miller</u> violations contemplated by the Supreme Court in <u>Montgomery</u>. It notes that, in suggesting parole-eligibility as an alternative to resentencing, <u>Montgomery</u> cited a Wyoming statute that makes juvenile homicide offenders eligible for parole after serving twenty-five years—the same amount of time such offenders must serve before becoming parole-eligible under SB 590. And because Plaintiffs' sentences are now "life *with* the possibility of parole," the court concludes their constitutional injuries are wholly cured, and <u>Miller</u> and <u>Montgomery</u> have no application to their parole board hearings.

But this narrow reading of <u>Montgomery</u> ignores its underlying, substantive reasoning. In <u>Montgomery</u>, the Court explained that if states were to remedy <u>Miller</u> violations by "[e]xtending parole eligibility to juvenile offenders . . . [t]he opportunity for release w[ould] be afforded to those who *demonstrate* the truth of <u>Miller</u>'s central intuition—that children who commit even heinous crimes are capable of change." 577 U.S. at 212 (emphasis added); <u>see also</u> <u>id.</u> ("Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment."). <u>Montgomery</u> therefore envisioned a process whereby a parole board would consider the juvenile offenders' youth and its attendant characteristics when deciding whether to grant them parole—and where the juvenile offenders would, at minimum, be provided with an opportunity to "demonstrate the truth of <u>Miller</u>'s central intuition" during the parole review process.

To reflexively endorse any purported <u>Miller</u> cure that simply offers juvenile offenders nominal access to parole ignores <u>Montgomery</u>, and risks depriving those offenders of the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" to which they are constitutionally entitled. <u>Miller</u>, 567 U.S. at 479 (quotation omitted). Otherwise, a state could simply declare that all inmates whose sentences violate <u>Miller</u> are "eligible" for parole but then implement procedures that do not allow consideration of age-related mitigation or that otherwise make it impossible for anyone, as a practical matter, to receive a grant of parole. If a juvenile offender's sentence is labeled as "life with parole," but is nevertheless the functional equivalent of a life sentence without parole, then the state has denied that offender the "opportunity for release" that the Eighth Amendment requires. <u>Montgomery</u>, 577 U.S. at 212. Prisoners like Plaintiffs "must be given the opportunity to show their crime did not reflect irreparable corruption," and to be considered for parole on this basis. <u>Id.</u> at 213. Therefore, to ensure that Plaintiffs' unconstitutional sentences are truly remedied, we must look beyond the label of "parole" and examine the procedures provided by SB 590.[4]

---

[4]The court attempts to analogize this case to <u>Bowling v. Director, Virginia Department of Corrections</u>, where the Fourth Circuit held that the Eighth Amendment did not require the Virginia Parole Board to specifically consider age-related mitigation characteristics when it processed the parole application of a juvenile offender originally sentenced to life *with parole*. 920 F.3d 192, 197–98 (4th Cir. 2019). Importantly, the plaintiff in <u>Bowling</u>, unlike Plaintiffs here, never received an unconstitutional sentence requiring remedial action under <u>Miller</u> and <u>Montgomery</u>. Because that plaintiff's sentence was constitutional from the outset, the Fourth Circuit found that the protections of <u>Miller</u> and <u>Montgomery</u> did not apply. <u>Id.</u> In contrast, Plaintiffs here are being afforded parole eligibility as a remedy to cure their unconstitutional sentences. And in order to remedy that injury, Plaintiffs must be afforded some opportunity to have age-related mitigation characteristics considered by a decisionmaker at either a resentencing hearing or during a parole review process. See <u>Miller</u>, 567 U.S. at 479.

-18-

Next, the court assumes for the sake of analysis that the Eighth Amendment applies to Plaintiffs' parole proceedings, and then concludes there is no violation here because Missouri has provided "some meaningful opportunity" for Plaintiffs to obtain release based on demonstrated maturity and rehabilitation. But the record does not support this conclusion.

Missouri's parole review process is lacking in several key respects. First, it limits Plaintiffs' access to information and their ability to effectively advocate for their release on parole. Plaintiffs are prohibited from reviewing their parole files. This makes it nearly impossible for them to identify potential factual errors in their records or to adequately respond to adverse evidence that may have direct bearing on the parole board's decision on whether they have "demonstrated maturity and rehabilitation." At the hearings themselves, Plaintiffs are limited to having one "delegate" attend the hearing on their behalf. And that delegate is permitted to "address only issues related to transition to the community, which could include offender growth, support system, home and employment." Under these rules, a delegate may not, for example, provide information or evidence about any abuse or trauma suffered by the Plaintiff leading up to the underlying crime or relatedly whether the Plaintiff's circumstances indicated his crime "reflect[ed] the transient immaturity of youth." Montgomery, 577 U.S. at 208.

The court questions whether delegates are truly limited to addressing only issues related to an inmate's transition to the community upon release under SB 590. It criticizes the district court for citing "only one parole hearing" to support its conclusion that this constraint exists before selectively pointing to anecdotes from two other hearings which purportedly show "that there is no undisputed practice in Missouri that directs an inmate's delegate at a parole hearing to discuss only an inmate's home plan." But the court ignores the fact that this very limitation appears in the written "Parole Hearing Procedures" adopted by Director Precythe. As noted by the district court, Missouri's Parole Hearing Procedures expressly state that "[t]he

-19-

delegate [for the offender] will address *only the issues related to transition to the community*, which could include offender growth, support system, and employment," and that "[t]he hearing panel may limit any irrelevant or repetitious statement(s)." Further, the State does not seriously challenge the district court's holding that delegates generally cannot discuss an inmate's maturity and rehabilitation. When the party against whom a holding is made does not challenge it on appeal, we typically do not address the matter. I see no reason to depart from our usual course here to create a dispute on appeal, especially where there may be good reason why the State did not press the issue.

In any event, the two parole hearings discussed by the court do not demonstrate that delegates are free to discuss an inmate's maturity and rehabilitation. The court points to one hearing where the Plaintiff's delegate said the Plaintiff grew up in "deep poverty" and "deep neglect." R. Doc. 134-15, at 49. But the delegate's remarks were exceedingly brief, and she did not elaborate on any circumstances from the Plaintiff's youth to explain this statement, nor did she present any evidence in support. As to the delegate who described a Plaintiff's tumultuous upbringing, it is apparent that this delegate was the Plaintiff's sister. In addressing the Plaintiff's anticipated transition to the community, she described a job waiting for him in the family business and said she was "a representative of his entire support network." In her statement, she also provided some examples of the abuse the children in their family suffered but she too presented no evidence. R. Doc. 134-16, at 33–37. One delegate's passing reference to poverty and neglect and another's brief description of the difficult upbringing she shared with her brother do not change the plain language of Missouri's Parole Hearing Procedures expressly limiting what a delegate may address at the hearing. Even assuming these two instances represent examples of constitutionally adequate hearings, the State has not shown that the opportunity to present evidence of maturity and rehabilitation is available to Plaintiffs as a matter of course. As illustrated by the hearing cited by the district court, the limitation in the Parole Hearing Procedures has been strictly enforced in practice at least some of the time. There, when the

-20-

Plaintiff's delegate asked if she could "say anything in regards to the whole case," a panel member responded that they "were not going to retry the case" and that they "just want to know what kind of support you have for [the Plaintiff]." R. Doc. 139-32, at 45. Thus, contrary to the court's suggestion otherwise, a delegate is not guaranteed the opportunity to discuss any topic other than "transition to the community, which could include offender growth, support system, home and employment."

In contrast to the constraints placed on Plaintiffs and their delegates, victims may speak for any length of time, may speak outside of the inmate's presence, and are not limited in what they may speak about. Prosecutors and law enforcement representatives, too, are allowed to provide information without limitation on time or subject matter. Plaintiffs and their representatives—not victims or prosecutors—are the ones most likely to have information about the constitutionally relevant factors of maturity and rehabilitation. See Miller, 567 U.S. at 479. Yet Missouri's parole review process obstructs the Board's ability to hear and consider evidence reflecting those factors.

Missouri's parole review process also obfuscates whether the Board has truly considered the "distinctive attributes of youth" that make juvenile offenders unique for constitutional purposes. See Miller, 567 U.S. at 471–73. The Board uses a "barebones, boilerplate form" to inform Plaintiffs if they have been denied parole. The forms are unsigned and do not indicate how the Board voted or reached its decision. Significantly, the forms provide only two general reasons for denying parole: (1) that release "would depreciate the seriousness of the present offense," or (2) that there appears not to be a "reasonable probability at this time that the offender would live and remain at liberty without again violating the law." Even if the Board is not required to specifically identify the factors it relied upon to deny parole, cf. Jones, 141 S. Ct. at 1318–19, the form reflects the view that only these two factors are under consideration, which is contrary to Miller and Montgomery, see id. at 1316

(noting that, under Miller, "an offender's youth and attendant characteristics" must be considered as mitigating factors). The lack of detail on these forms risks transforming the Board's analysis from what might otherwise be a thoughtful, contextual review of the Plaintiffs' unique characteristics as juvenile offenders into a perfunctory one, based solely on the perceived heinousness of the Plaintiffs' underlying crimes.

Missouri "freely admit[s] that these forms do not provide adequate explanation for the Board's decision." Nevertheless, Missouri refuses to provide Plaintiffs access to the recordings of their hearings and expects Plaintiffs to get additional information about a denial from their parole officers, at the same time acknowledging that parole officers have no knowledge of the Board's reasoning since they do not attend parole hearings. For a juvenile offender denied parole, this opaque process greatly impedes his ability to understand the basis for the Board's decision and prepare accordingly for a future parole hearing.

Finally, although SB 590 instructs the Board to consider factors like Plaintiffs' "[e]fforts made toward rehabilitation" and "subsequent growth and increased maturity," the Board's policies and practices are not structured to focus on those crucial considerations. Before Plaintiffs' challenge to SB 590's parole review process, the Board did not use risk assessment tools or evidence-based, objective criteria to evaluate a Plaintiff's suitability for parole, relying on wholly subjective standards instead. Additionally, much of the focus of Plaintiffs' parole review hearings—in both the questioning and the witness statements—was on the underlying offense, and most of their parole denials turned on the "circumstances surrounding the [underlying] offense." But the circumstances of the underlying offense are constitutionally relevant only to the extent they pertain to the constitutionally relevant question: whether the crime reflects a Plaintiff's "irreparable corruption" or "transient immaturity." Montgomery, 577 U.S. at 208. Nothing in Missouri's parole review process convinces me that Missouri actually considers Plaintiffs' crimes in this way,

creating a real risk that the Board instead relies on the heinousness of the underlying offenses (all murders) to deny parole without consideration of Plaintiffs' maturity and rehabilitation.

Missouri's parole policies and practices, when considered in combination as implemented, work to deprive Plaintiffs of their Eighth Amendment right to a meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation. See Miller, 567 U.S. at 479. The Supreme Court has clearly stated that juvenile offenders are "constitutionally different" than adult offenders, id. at 471, and "should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential," Graham, 560 U.S. at 79. Because the parole review process in place under SB 590 fails to adequately "ensure[] that juveniles whose crimes reflect[] only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence," Montgomery, 577 U.S. at 212, it violates the Eighth Amendment.

I respectfully dissent.

_____