2023 IL App (2d) 220066
No. 2-22-0066
Opinion filed June 22, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-3321 |
| JOSHUA CAVAZOS, | ) ) ) | Honorable Donald Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Kennedy and Schostok concurred in the judgment and opinion.
Justice Schostok also specially concurred, with opinion.

**OPINION**

¶ 1    In 2011, a jury convicted defendant, Joshua Cavazos, of two counts of first degree murder

(720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)), attempted first degree murder (*id.* §§ 8-4(a), 9-

1(a)(1)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and

aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)) for crimes he committed

in 2007, when he was 17 years old. Further, regarding the first degree murder and attempted-

murder convictions, the jury found that defendant personally discharged the firearm used in those

crimes. The trial court denied defendant's posttrial motion, but granted, in part, his motion to

reconsider his sentence and, ultimately, sentenced him to an aggregate of 75 years' imprisonment.

¶ 2 On appeal, this court rejected defendant's arguments concerning the sufficiency of the evidence, jury instructions, proof of specific intent for the attempted murder, and, overall, the constitutionality of his sentence. *People v. Cavazos*, 2015 IL App (2d) 120171 (*Cavazos I*). However, our supreme court entered a supervisory order, directing us to vacate our prior judgment and to consider the effect of *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constituted an unconstitutional *de facto* life sentence, warranting a different result. *People v. Cavazos*, No. 119208 (Ill. Mar. 25, 2020) (supervisory order) (*Cavazos II*). Pursuant to those instructions and upon further review, we affirmed defendant's conviction but vacated his sentence and remanded for a new sentencing hearing. *People v. Cavazos*, 2020 IL App (2d) 120171-B (*Cavazos III*).

¶ 3 Presently, defendant appeals from the trial court's imposition of a 50-year aggregate sentence on remand. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Trial

¶ 6 Detailed facts concerning the trial proceedings were set forth in *Cavazos I*, 2015 IL App (2d) 120171, ¶¶ 7-61. For context, however, we summarize that, on January 20, 2007, 15-year-old Oscar Rodriguez and his girlfriend, Claudia Lozano, were walking along High Street near Grove Street in Aurora. A sport utility vehicle drove past, with occupants throwing gang signs and yelling gang slogans, and, then, four gunshots were fired, killing Rodriguez and injuring Lozano. Defendant, age 17, and his brother, Justin Cavazos, age 16, both members of the Insane Deuces street gang, were charged in connection with the incident. In 2011, the brothers were tried simultaneously (in adult court) by separate juries.

¶ 7    As previously noted, the jury convicted defendant of two counts of first degree murder and found that he personally discharged the firearm that proximately caused Rodriguez's death. The jury also convicted defendant of attempted first degree murder and found that he personally discharged the firearm used in that crime. Finally, the jury found defendant guilty of aggravated discharge of a firearm and unlawful possession of a stolen motor vehicle.

¶ 8                                              B. Sentencing

¶ 9    On January 18, 2012, the trial court denied defendant's motion for a new trial and proceeded to sentencing.

¶ 10    In announcing its sentence, the court noted that, while defendant was apparently a "very nice" young man and a gifted athlete in his early years, his behavior altered after a custody modification. The court recounted that defendant's criminal history included a few minor offenses, but also a Class 3 felony; defendant had declined to participate in an interview concerning his background; and defendant had a young daughter and a family who would all be impacted by the imposed sentence. The court commented that, at a young age, defendant chose the Insane Deuces over many wonderful things in his life, including his freedom. It sentenced defendant to 25 years' imprisonment for first degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2006) (providing range of 20 to 60 years)), with a 25-year add-on for personally discharging the firearm that caused Rodriguez's death (see *id.* § 5-8-1(a)(1)(d)(iii) (add-on may be 25 years to natural life)). The court sentenced defendant to 10 years' imprisonment for attempted first degree murder (see *id.* § 5-8-1(a)(3) (providing range of 6 to 30 years)), with a 20-year add-on for personally discharging the firearm (see *id.* § 5-8-1(a)(1)(d)(ii)). The murder and attempted-murder sentences were to be served consecutively (see *id.* § 5-8-4(d)). Finally, the court sentenced defendant to three years'

imprisonment for possession of a stolen motor vehicle (see *id.* § 5-8-1(a)(5) (providing range of three to seven years)), to run concurrently with the attempted-murder sentence.

¶ 11   Defendant moved to reconsider the sentence, asking that the court grant the minimum aggregate sentence (which, at the time and under these circumstances, was 71 years' imprisonment), rather than the 80 years imposed, as the imposed sentence did not adequately take into account his rehabilitative potential. On February 12, 2012, the court granted the motion in part, reducing the murder sentence by 5 years (*i.e.*, to the minimum of 20 years), resulting in an aggregate 75-year sentence.

¶ 12                           C. Appellate Proceedings

¶ 13   On direct appeal, defendant raised multiple arguments, including a challenge to the constitutionality of the statutory provisions that resulted in his trial in adult court and his ultimate sentence. He argued that the confluence of his mandatory transfer to adult court and the application to juveniles of mandatory firearm enhancements, mandatory consecutive sentencing, adult sentencing ranges, and "truth in sentencing" provisions did not permit consideration of his youthfulness at the time of the offense and, thus, his sentence was unconstitutional. We rejected his arguments. *Cavazos I*, 2015 IL App (2d) 120171, ¶¶ 92-102. However, we questioned whether the General Assembly should revisit the juvenile sentencing scheme, and we found "particularly troubling" the limitations placed upon a sentencing court's discretion when mandatory sentencing enhancements applied to a juvenile offender. *Id.* ¶¶ 101-02.

¶ 14   Thereafter, our supreme court denied defendant's petition for leave to appeal, but, as noted, it directed this court to vacate our prior decision and to consider the effect, if any, of *Buffer*— which held that a term of imprisonment exceeding 40 years constitutes a *de facto* life sentence for a juvenile (*Buffer*, 2019 IL 122327, ¶¶ 41-42)—on defendant's sentence. *Cavazos II*, No. 119208

(Ill. Mar. 25, 2020) (supervisory order). Upon review, we summarized the evolution of juvenile sentencing law, determined that defendant's sentence violated the eighth amendment, vacated the sentence, and remanded for a new sentencing hearing. *Cavazos III*, 2020 IL App (2d) 120171-B, ¶¶ 23-26. In our concluding paragraphs, we noted that, consistent with the prevailing juvenile-sentencing standards at the time of remand, " '[o]n remand, the trial court could once again impose a *de facto* life sentence only if it determines that the defendant is beyond rehabilitation.' " *Id.* ¶ 25 (quoting *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 32).

¶ 15                              D. Sentencing on Remand

¶ 16    On February 16, 2022, defendant's new sentencing hearing commenced before Judge Donald J. Tegeler (the original sentencing judge, Timothy Sheldon, had retired).

¶ 17    The presentence investigation reflected that defendant is a father figure to two children (one his biological child) and speaks to them multiple times per week. He is no longer affiliated with the Insane Deuces or any street gang, and he wishes to work with at-risk youth. Defendant submitted 12 letters of support from family members and friends; numerous certificates, reflecting his completion of several courses while incarcerated; GED results, reflecting that he has passed the language arts, reading, and social studies sections of that exam; and a perfect score on a computer programming exam. In addition, defendant submitted an academic paper concerning juvenile development for sentencing purposes and a report of an evaluation of defendant by Dr. James Garbarino, a psychologist and child and adolescent development consultant. Dr. Garbarino opined that the circumstances of defendant's youth contributed to his immature impulsiveness and entry into a street gang. Further, Garbarino opined that defendant had matured since the offense, his adult development has taken a "decidedly positive direction," he is not "irreparably corrupt,"

and he is "well positioned developmentally and socially to make the transition from prison to success in the outside world."

¶ 18    Defendant's stepfather, Mike Loken, testified that defendant had lived with him and defendant's mother prior to his arrest in this case. Defendant worked two jobs—a full-time day job as a carpenter with Loken and a part-time night job at a movie theater—while caring for his one-year-old daughter, who also lived with them. According to Loken, defendant has matured and, over the years, has improved his ability to handle anger and impatience.

¶ 19    Defendant made a statement in allocution. In part, he apologized to Rodriguez's family and his own. Defendant explained that he has learned from his mistakes and he hopes to rejoin society and deter youth from participating in gang activities.

¶ 20    The State stated that it would again rely on the evidence it had used at the original sentencing, as well as four impact statements from Rodriguez's family. Further, it presented testimony from two officers, both describing encounters that they had with defendant in 2007, one in which he asked when the last time was that an Aurora police officer had been killed and the other when he was present, but not the shooter, when shots were fired at a Latin Kings member.

¶ 21    The trial court noted the changes in juvenile sentencing since Judge Sheldon had imposed the original sentence. It noted that credit towards time served may be considered and that the new parole statute for persons under the age of 21 at the time of the offense, section 5-4.5-115(b) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-115(b) (West 2020)), now offered defendant a "meaningful opportunity" for release after serving 20 years. See *Graham v. Florida*, 560 U.S. 48, 75 (2010) ("[T]he State must *** give [a juvenile convicted of a nonhomicide offense] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."). The court rejected defendant's argument that, because parole, unlike day-for-day

credit, is discretionary, it is not a meaningful opportunity for release. The court noted that defendant possessed "a lot of control" over the parole opportunity because, even though the Prisoner Review Board (Board) ultimately votes and renders the decision, defendant controls how he behaves, what he does while imprisoned, and how he rehabilitates. Further, the court noted that, unlike executive clemency, where defendant would not have the opportunity to argue to the governor, defendant would have a significant say before the Board. The court also noted that it could not address defendant's argument concerning whether proposed legislative changes would restrict the ability to obtain release through parole, as the court could not know what the future holds.

¶ 22    The court adopted Judge Sheldon's findings concerning the factors in aggravation and mitigation, finding those unchanged. The court also addressed each of the factors in section 5-4.5-105 of the Code, which must be considered before sentencing a defendant who committed an offense before age 18. See *id.* § 5-4.5-105. In relevant part, it noted first that, at the time of the offense, defendant was age 17, just three months shy of his 18th birthday, and, thus, was an older adolescent. The court acknowledged that defendant experienced peer pressure as a gang member and was "probably expected to be in a gang" and that "[i]t would take a lot for him to say no based upon where he was coming up from." The court found that defendant had a decent family environment and his family attempted to find him a school out of the area. As for rehabilitation, the court found that "there is some rehabilitation potential in this gentleman. His record up until the murder was basically nothing." The court noted that, during the period the case remained unsolved, defendant committed another gun offense and served some prison time; however, and in part due to family support, he did not violate the terms of his parole. The court read "word-for-word" the report submitted by Dr. Garbarino.

¶ 23    The court found the circumstances of the offense "horrendous. Plain and simple," adding, "I have never understood, I probably never will understand, why if you throw a gang sign one way or the other that gives somebody the right to put a bullet in your head." The court disagreed that the crime was impulsive, finding that it was planned in that the four participants wanted to go shoot someone from a rival gang, they drove to the area where that could be accomplished, they made a conscious decision to pass a gun around, and defendant made the decision to pull the trigger. Defendant was an adolescent at the time, but he "absolutely knew what he was doing"; afterwards, he was proud of it and changed his nickname and got a tattoo. "He may not be proud of it now, which shows that he does have rehabilitation potential, and it shows that he might be a decent human being and a productive member of society[.]" However, "[t]hey did plan this. They just didn't plan who it was going to be because they didn't care who it was. They just wanted to do it." And, with respect to defendant's degree of participation, defendant was the shooter.

¶ 24    The court noted that the State did not argue that defendant was "irretrievable" or "incorrigible," and it agreed that defendant did not meet that criteria. It recognized that defendant had rehabilitative potential and that he had virtually no serious infractions during the roughly 13 years he had been imprisoned. "They have not found him with any weapons and he's not done anything violent, so I find that that is another factor that goes to his potential rehabilitation." However, the court found that a "stiff sentence" remained appropriate, where four gunshots were fired, with three hitting and killing Rodriguez, including one to his head, and the fourth hitting and injuring Lozano.  Finally, the court noted that defendant was able to participate in his defense.

¶ 25    The court recognized that the imposition of firearm enhancements is now discretionary (see *id.* § 5-4.5-105(b), (c)) and that *Buffer* held that anything more than 40 "actual years" is a *de facto* life sentence, "before the parole issue." It did not find any reason to increase defendant's sentence

from that previously imposed. Ultimately, it sentenced defendant to 20 years' imprisonment for first degree murder, to be served at 100%, but declined to impose the 25-year firearm enhancement. The court imposed a 10-year sentence for attempted murder, to be served at 85%, and elected to also impose the 20-year firearm enhancement, as was applied in defendant's original sentence. The court explained,

> "This wasn't one bullet. This was four bullets. This wasn't one victim. This was two victims. Had there not been a gun in this case, we would not have a victim most likely. *** [H]ad a gun not been involved *** we probably don't have four bullets flying around the City of Aurora and two people being shot, one fatally."

¶ 26    Next, the court explained that, although the aggregate sentence totaled 50 years, part of the sentence would be served at 85% and, thus, "actual time served" would be a little over 45 years. Although it acknowledged that figure exceeded the 40-year mark announced in *Buffer*, it found that, for two reasons, the sentence was not a *de facto* life sentence. First, "I find that that is acceptable in this case because of the new parole statute where he has a meaningful opportunity to ask for parole after serving 20 years[.]" The court again noted that defendant was in control over whether he receives parole.

¶ 27    Further, the court continued, defendant would receive credit for the time he had already served, which was just over 13 years, and it noted:

> "So actual time from this sentence, and as I read *Buffer*, it's from when I sentence him, the actual time in cannot be more than 40, actual time in from this case. Because as I read the law, the original sentence is void. It is gone. It's history. This is his sentence. Actual time in, therefore, is about 32 years, eight years under *Buffer* and he's still eligible for parole under the new statute.

Now, I know there may some argument in relation to that that it is still more than 40, but I find that, number one, the parole statute is a meaningful opportunity and I find that 45-and-a-half years here because that meaningful opportunity under the parole statute does not violate *Buffer* and I believe that when you look at the time served since arguably at this point he had to start from zero, so I have to assume he's been in custody for 13 years, I am not giving him day-for-day credit because, quite frankly, on the murder, he would not have gotten it anyway. At 13 years, the actual time in the department of corrections is 32-and-a-half years."

¶ 28 Defendant moved the court to reconsider, in part asking the court to impose a 30-year sentence. On March 2, 2022, the court denied the motion. Defendant timely appeals.

¶ 29                                II. ANALYSIS

¶ 30 On appeal, defendant raises numerous arguments challenging his sentence. First, defendant argues that the trial court erred where, to determine whether the "actual time" served would constitute a *de facto* life sentence, it subtracted the time he served prior to resentencing. He contends that, in doing so, the court misapprehended applicable law, violating his right to due process. Second, defendant argues that, where the court made no finding that he is permanently incorrigible, its decision to impose a *de facto* life sentence violated both this court's mandate and the eighth amendment to the federal constitution (U.S. Const., amend VIII), the latter, in part because the parole statute does not afford him a meaningful opportunity for release. Third, defendant argues that, where the court made no finding that he is permanently incorrigible, its decision to impose a *de facto* life sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Fourth, defendant contends that his sentence violates both the eighth amendment and the proportionate penalties clause because the court's findings

contradicted *Miller v. Alabama*, 567 U.S. 460 (2012), were incompatible with Illinois law and evolving standards of decency, and were improper, requiring reversal. Fifth, defendant argues that his 50-year sentence is excessive, in light of his youth, significantly diminished moral culpability, and potential for rehabilitation.

¶ 31    The State responds, with respect to defendant's first, second, and third arguments, that defendant did not receive a *de facto* life sentence in violation of the eighth amendment, proportionate penalties clause, or this court's mandate, because the new parole statute affords defendant a meaningful opportunity for release. Moreover, with respect to defendant's fourth and fifth arguments, the State responds that, even though defendant did not receive a *de facto* life sentence without the possibility of parole, the court nevertheless properly applied *Miller* and did not consider improper factors and, thus, defendant's sentence cannot, in light of the aggravating and mitigating factors, be characterized as excessive.

¶ 32                    A. Subtraction of Time Served from 40-Year Calculation

¶ 33    Generally, we review for an abuse of discretion a trial court's sentencing decision. See, *e.g.*, *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). However, when the issue is whether a sentencing court misapprehended applicable law, our review is *de novo*. See, *e.g.*, *People v. Moore*, 207 Ill. 2d 68, 75 (2003).

¶ 34    We agree with defendant that the trial court apparently misapprehended applicable law. Specifically, the court imposed a 50-year sentence, comprised of (1) 20 years at 100% for first degree murder, to be served consecutively to (2) 10 years for attempted murder, plus 20 years for personally discharging a firearm during the attempted murder, both to be served at 85%. The court noted that defendant would therefore serve an aggregate term of 45 years but concluded that it was not imposing a *de facto* life sentence, in part, because defendant would receive credit for the 13

years that he had already served prior to resentencing and his "[a]ctual time in, therefore, is about 32 years, eight years under *Buffer*." As defendant notes, the court apparently mistakenly believed that, in considering whether the sentence exceeded the 40-year limit set forth in *Buffer*, it should first subtract any time defendant had already served and then simply assess whether the "actual time" *remaining* to be served exceeds 40 years. The State does not respond to defendant's argument substantively, instead suggesting only that he misrepresents the record. We disagree. One of the court's expressed reasons for believing that the 50-year sentence did not exceed *Buffer*'s 40-year threshold was that only 32 years of "actual time" remained. While *Buffer* did concern the amount of time a juvenile offender serves, and held that more than 40 years is equivalent to a life sentence, nothing in the decision suggests that the figure is derived by subtracting the time already served and considering only the time to be served going forward. As defendant notes, the court in *Buffer* performed no such calculation when holding that the 50-year sentence in that case exceeded 40 years and, thus, was a *de facto* life sentence, nor did it suggest that the trial court should so calculate at resentencing on remand. See *Buffer*, 2019 IL 122327, ¶¶ 42-49. Indeed, the State cites no authority to suggest that a court should subtract from the aggregate term the amount of time already served to determine whether the sentence complies with *Buffer*. In our view, "actual time" served, and whether that amount exceeds 40 years, includes *all* time served, not just the amount remaining to be served after a sentence is imposed.

¶ 35    However, we disagree with defendant that the trial court's misapprehension of applicable law warrants a new sentencing hearing. A misapprehension of applicable law warrants a new sentencing hearing only where the mistake arguably influenced the sentencing decision. *People v. Eddington*, 77 Ill. 2d 41, 48 (1979) (but holding, in that case, that the sentencing court's mistaken understanding of law was harmless and did not arguably influence the sentence, because it clearly

had not served as the court's "reference point" in fashioning the sentence); see also *People v. Myrieckes*, 315 Ill. App. 3d 478, 484 (2000) (a sentencing court's mistaken belief influenced the sentencing decision if the court's comments reflect it relied on the mistake as a reference point in fashioning the sentence; holding the record "suggests" that the sentencing court fashioned the sentence mistakenly believing that the defendant was eligible for extended-term sentencing when he was not, which might have contributed to an excessive sentence, even though within the nonextended range); *People v. Hausman*, 287 Ill. App. 3d 1069, 1072 (1997) (remanding for a new sentence hearing where the record was not clear whether the trial court sentenced the defendant to three years' imprisonment believing that was the minimum sentence or because it found it a proper sentence). Here, consideration of time already served was only one piece of the court's analysis, and we disagree that it served as the court's reference point for fashioning the sentence. Indeed, the record is clear that the court was focused on an alternative basis for its decision, and we may affirm the court's decision on any basis supported by the record. See, *e.g.*, *People v. Boyd*, 2021 IL App (1st) 182584, ¶ 70. Specifically, for the reasons described below, we agree with the court's assessment that, despite the number of years, the sentence here does not constitute an unconstitutional *de facto* life sentence, because the new parole statute, section 4-4.5-115, offers defendant a meaningful opportunity for release before 40 years are served.

¶ 36                    B. Permanent Incorrigibility and the Eighth Amendment

¶ 37    Defendant next raises numerous arguments concerning the court's decision to impose, absent a finding of permanent incorrigibility, a "*de facto* life sentence," as well as arguments concerning whether the new parole statute provides the "meaningful opportunity" (*Graham*, 560 U.S. at 75) for a juvenile offender's release contemplated by the federal and state constitutions. Defendant notes that, according to *Buffer*, a life sentence for a juvenile is one exceeding 40 years

and, here, he received 50 years. Further, he notes that the court expressly found that he is *not* permanently incorrigible and that he has rehabilitative potential. As such, defendant argues, the court's imposition of a *de facto* life term violated this court's mandate and the eighth amendment, which, according to *People v. Holman*, 2017 IL 120655, ¶ 40, *overruled by People v. Wilson*, 2023 IL 127666, ¶ 42,[1] prohibits a life term for a juvenile without a finding of permanent incorrigibility.

¶ 38   We review *de novo* the question whether a sentence violates the eighth amendment. See *e.g.*, *People v. Johnson*, 2018 IL App (1st) 140725, ¶¶ 97-98. For the following reasons, we disagree that the sentence here violates the eighth amendment.

¶ 39                                   i. Permanent Incorrigibility

¶ 40   Preliminarily, as context for addressing defendant's arguments, it is important to remember that *Buffer*, coupled with the state and federal case law preceding it, derived from the concern that juvenile offenders cannot be sentenced to death and cannot be sentenced to life imprisonment without parole without any meaningful consideration of the attendant circumstances of youth. See *Miller*, 567 U.S. at 483 (even for those convicted of homicide, the eighth amendment prohibits "a sentencing scheme that mandates life in prison *without possibility of parole* for juvenile offenders"; however, a court may sentence a juvenile to life without parole if it first adequately considers youth and its "attendant circumstances" (emphasis added)); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (when imposed on juvenile offenders for crimes other than homicide, a life sentence *without the possibility of parole* violates the eighth amendment); *Roper v. Simmons*, 543 U.S. 551, 568-73 (2005) (capital punishment for juvenile offenders violates the eighth amendment); *Holman*, 2017

---

[1]As noted below (*infra* ¶ 44), *Holman* was overruled after briefing in this case was complete.

IL 120655, ¶ 40 ("*Miller* applies to discretionary sentences of life *without parole* for juvenile defendants." (Emphasis added.)); *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10 (*Miller* applies to sentences that cannot be served in one lifetime and, thus, have the same practical effect on a juvenile as a mandatory life sentence without parole). As noted, the court in *Buffer* clarified that a life sentence for a juvenile includes a term of imprisonment exceeding 40 years. See *Buffer*, 2019 IL 122327, ¶¶ 41-42.

¶ 41   However, we emphasize that a defining characteristic in the sentences considered in the foregoing case law was no possibility of parole. Indeed, even in *Holman*, the case upon which defendant heavily relies, the court held, "[u]nder *Miller* and *Montgomery* [*v. Louisiana*, 577 U.S. 190, 136 S. Ct. 718 (2016)], a juvenile defendant may be sentenced to life imprisonment *without parole*, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." (Emphasis added.) *Holman*, 2017 IL 120655, ¶ 46. As noted, *Miller* also discussed a sentence of life without the possibility of parole and expressed that the attendant circumstances of youth must be considered before "*irrevocably* sentencing [juveniles] to a lifetime in prison." (Emphasis added.) *Miller*, 567 U.S. at 480. Moreover, it is relevant that, in *Montgomery v. Louisiana*, 577 U.S. 190, 211-12 (2016), the United States Supreme Court discussed life "without parole" and determined that, rather than resentencing every juvenile who was sentenced to mandatory life without parole, a state could remedy the constitutional violation by simply permitting juvenile offenders to be considered for parole. The Court cited favorably Wyoming's statute that afforded juveniles the opportunity for parole after 25 years' imprisonment. *Id.* at 212. Further, it noted,

"[e]xtending parole eligibility to juvenile offenders does not impose an onerous burden on the States, nor does it disturb the finality of state convictions. Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Id.*

Accordingly, the availability of parole to a juvenile offender is a critical piece in assessing whether a "life sentence" passes constitutional muster.

¶ 42    In response to *Miller* and its progeny, this state has taken at least three critical steps towards rectifying the core concerns implicated when sentencing juvenile offenders, *all* of which the court applied to defendant's sentence here. First, the *Miller* factors have been codified, and a court sentencing a juvenile offender is now required to consider in mitigation (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any; (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences; (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma; (4) the person's potential for rehabilitation or evidence of rehabilitation, or both; (5) the circumstances of the offense; (6) the person's degree of participation and specific role in the offense, including the level of planning by the person before the offense; (7) whether the person was able to meaningfully participate in his or her defense; (8) the person's prior juvenile or criminal history; and (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate, although, if the person chooses not to make a statement on

advice of counsel, a lack of an expression of remorse shall not be considered as an aggravating factor. See 730 ILCS 5/5-4.5-105(a) (West 2016). Second, to the extent that a juvenile defendant personally discharged a firearm during the offense, sentencing courts now have *discretion* to apply firearm enhancements. See 730 ILCS 5/5-4.5-105(b), (c) (West 2018). Third, nearly all juvenile offenders now have the possibility of parole. See 730 ILCS 5/5-4.5-115(b) (West 2020). Specifically, a juvenile offender convicted of first-degree murder, like defendant here, shall be eligible for parole review after serving 20 years of his or her sentence. *Id.*

¶ 43     As such, defendant's sentence here is not a *de facto* life sentence without the possibility of parole, requiring a finding of permanent incorrigibility. Although he received a term of years exceeding 40, defendant cannot ignore that the court found him eligible for parole or that the eligibility is triggered at 20 years and, accordingly, before serving the equivalent of a life sentence. Our conclusion finds support in *People v. Beck*, 2021 IL App (5th) 200252, ¶¶ 18-26, where the court rejected a juvenile defendant's argument that his 80-year sentence was an unconstitutional *de facto* life sentence. That decision does not discuss, but also does not reflect, that the sentencing court made an express finding that the defendant was permanently incorrigible. Nevertheless, the appellate court affirmed the sentence and, in doing so, disagreed with the defendant's argument, similar to that raised by defendant here, that the opportunity for parole is speculative and, therefore, not a meaningful opportunity for release. *Id.* ¶ 22. In doing so, the court cited *Montgomery*, as well as our supreme court's decision in *People v. Dorsey*, 2021 IL 123010, ¶ 56, and determined that "providing an opportunity to obtain parole remedies the constitutional violation of imposing a life sentence on a juvenile offender, as it resolves the primary concern of *Graham*—that a juvenile may one day change and reenter society." *Beck*, 2021 IL App (5th) 200252, ¶ 24; see *Dorsey*, 2021 IL 123010, ¶ 56 (noting, "[d]espite this lack of certainty in the parole system, the Supreme Court

has nonetheless held that extending parole eligibility to juvenile offenders satisfies the eighth amendment and that a State may remedy a *Miller* violation by merely permitting the offender to be considered for parole without any resentencing"). The *Beck* court concluded that, because the new parole statute afforded the defendant a meaningful opportunity for release based upon maturity and rehabilitation before a *de facto* life sentence of over 40 years' imprisonment is served, the defendant's sentence did not violate the eighth amendment or Illinois precedent. *Beck*, 2021 IL App (5th) 200252, ¶ 26.

¶ 44　　Thus, the relevant authority has emphasized that the concern is sentencing a juvenile to a life sentence *without parole* or the functional equivalent of a life sentence without parole (*i.e.*, more than 40 years), without first considering youth and its attendant circumstances. See, *e.g.*, *Buffer*, 2019 IL 122327, ¶¶ 41, 46; *Holman*, 2017 IL 120655, ¶¶ 45-46; see also *Montgomery*, 577 U.S. at 208. Defendant here did not receive a life sentence without parole. Defendant's arguments rely on *Holman*'s conclusion that "a juvenile defendant may be sentenced to life imprisonment *without parole*, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" (emphasis added) (*Holman*, 2017 IL 120655, ¶¶ 45-46). However, in *Jones v. Mississippi*, 593 U.S. ___, ___, 141 S. Ct. 1307, 1311 (2021), the Court more recently held that, prior to imposing a discretionary life sentence, even when that life sentence is one without parole, a sentencing court is *not* required to make a finding of permanent incorrigibility. Then, consistent with *Jones*, and after briefing in this case was complete, our supreme court overruled *Holman*'s requirement for a permanent-incorrigibility finding. *Wilson*, 2023 IL 127666, ¶ 42. Nevertheless, even if *Holman* had not been overruled, it remains that *Holman* concerned a life sentence without parole, in contrast to the case before us, where parole is available to defendant. To be sure,

defendant's argument here is that, per *Buffer*, a sentence of more than 40 years is the *equivalent* of life without parole. But again, we find guidance from *Dorsey*, which, although it considered day-for-day, good-conduct credit, reasoned, "a sentence imposed pursuant to a statutory scheme that affords a juvenile *an opportunity* to be released from prison after serving 40 years *or less* of the term imposed does *not* constitute a *de facto* life sentence." (Emphases added.) *Id.* ¶¶ 1, 62, 65. Moreover, although the court in *Dorsey* did not directly consider parole, it touched upon it, explaining that the "statutory scheme here, which allows for the *opportunity of release short* of a *de facto* life sentence, is at least on par with discretionary parole for a life sentence, which has specifically been held by the Supreme Court to pass muster under the eighth amendment." (Emphasis added.) *Id.* ¶ 54.

¶ 45     Defendant's reliance on *People v. Ruiz*, 2021 IL App (1st) 182401, *People v. Jordan*, 2022 IL App (1st) 160004-U, and *People v. Griffin*, 2021 IL App (1st) 170649-U is misplaced and does not alter our conclusion. True, those cases all acknowledged *Holman*'s requirement that, before imposing a *de facto* life sentence, a sentencing court must find permanent incorrigibility. See *Ruiz*, 2021 IL App (1st) 182401, ¶ 61-62 (yet noting that *Holman* may be questionable, considering *Jones*); *Jordan*, 2022 IL App (1st) 160004-U, ¶ 15; *Griffin*, 2021 IL App (1st) 170649-U, ¶¶ 53-54, 67 (yet noting that *Holman* may be questionable, considering *Jones*). But again, that requirement has been overruled.  *Wilson*, 2023 IL 127666, ¶ 42.  Moreover, *none* of those cases concerned the applicability of the new parole statute and its impact on those sentences. See *Ruiz*, 2021 IL App (1st) 182401, ¶ 70 (holding, in a decision that is no longer good law in light of *Dorsey*, that the trial court could not consider day-for-day credit in determining whether a sentence was *de facto* life; not discussing the possibility of parole under the new parole statute); *Jordan*, 2022 IL App (1st) 160004-U, ¶ 17 (allowing the defendant leave to file a second successive

postconviction petition, not discussing the new parole statute but noting that, per *Buffer*, youth and its attendant circumstances must be considered to sentence a juvenile to over 40 years of incarceration "*without possibility of parole*" (emphasis added)); *Griffin*, 2021 IL App (1st) 170649-U, ¶ 68 (noting that, "[a]t first blush," it would appear that the new parole statute would apply to the defendant on resentencing, but declining to decide that question; also declining to decide whether, if the defendant is eligible for parole after 20 years under the statute, such eligibility constitutes a *de facto* life sentence).

¶ 46     Here, again, there is no dispute that the court found that defendant *is* subject to the new parole statute and may apply for parole after serving 20 years, *i.e.*, before serving more than 40 years. Accordingly, even if *Holman* had not been overruled, it concerned life sentences without parole, *i.e.*, those that cannot be completed in 40 years or less, which is not the case here. Indeed, in one portion of his brief, defendant states that "*Miller* and *Holman* apply to any natural or *de facto* life term imposed on a juvenile offender, *unless* that sentence provides a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " (Emphasis added.) (quoting *Buffer*, 2019 IL 122327, ¶ 20). To be sure, the foregoing "unless" clause is critical here: where defendant is eligible for parole after serving 20 years' imprisonment, his sentence does not violate *Miller*.

¶ 47     Finally, although defendant asserts that we previously instructed the trial court that it could impose upon him a *de facto* life sentence *only* if it determined that defendant is beyond rehabilitation (see *Cavazos III*, 2020 IL App (2d) 120171-B, ¶ 25), that language cannot be divorced from the context that an improper *de facto* life sentence for a juvenile is one exceeding 40 years, *without* consideration of the attendant circumstances of youth or a meaningful opportunity for release before that term of years is served. Here, the trial court considered both the

attendant circumstances of youth, as required by section 5-4.5-105(a), *and* that, pursuant to section 5-4.5-115(b), defendant is eligible for parole before he has served more than 40 years. As such, we simply disagree that the trial court's sentence violated this court's mandate.

¶ 48    In sum, we agree with the trial court's determination that, because defendant has a meaningful opportunity for release before serving more than 40 years, his sentence is not equivalent to a life sentence without parole. Accordingly, we reject defendant's arguments that, because the court made no finding of permanent incorrigibility, he received a *de facto* life sentence that violates the eighth amendment or this court's prior mandate.

¶ 49                              ii. Parole and Meaningful Opportunity for Release

¶ 50    Relatedly, we also disagree with defendant's argument that his sentence remains unconstitutional because the new parole statute does not offer him a *meaningful* opportunity for release. Defendant does not outright argue that Illinois's new parole statute and process are unconstitutional. Rather, in a more roundabout fashion, defendant argues that his sentence remains governed by *Miller* and *Holman*, as the chance for a juvenile offender to obtain parole in Illinois is not meaningful or realistic. Thus, he continues, his sentence remains one of *de facto* life without parole and, accordingly, the absence of a finding of permanent incorrigibility renders his sentence unconstitutional. More specifically, defendant argues, in sum, that the new parole statute does not provide a meaningful opportunity for release because (1) limitations on parole opportunities are extreme and fall outside of our country's evolving standards of decency and (2) the parole rules conflict with *Miller*'s findings regarding juvenile culpability and rehabilitative potential. In essence, defendant takes issue with the fact that the new parole statute requires juvenile offenders to serve at least 20 years in prison before applying for review, then, if the first attempt is unsuccessful, they must wait another 10 years before seeking a second review, and, finally, if that

second review is unsuccessful, they are foreclosed from ever again seeking parole. See 730 ILCS 5/5-4.5-115(b), (m) (West 2020). Defendant explains that, across the country, no other state comes close to our mandatory 10-year interval between parole reviews noting that most states with parole systems provide for parole reviews every three years or less and, in some cases, every year. In addition, he explains that, whereas Illinois allows for only two lifetime parole reviews, virtually all other states require or allow for unlimited parole reviews. Defendant contends, overall, that other states' legislative responses to *Miller* and approaches to parole opportunities for juveniles establish a "community consensus" against Illinois's harsh parole limitations. Moreover, defendant asserts that the parole system does not provide a meaningful opportunity to obtain release, because it contradicts *Miller* in that, (1) by allowing only two, distant parole opportunities, it does not recognize that minors are highly likely to reform their conduct over time; (2) it does not require consideration of juvenile offenders' special characteristics; (3) it mandates consideration of risk assessments that improperly treat youth-related mitigating factors as aggravating circumstances; and (4) it prohibits parole for juvenile offenders whose crimes were sufficiently "serious," irrespective of their youth, in contravention of *Miller*'s core holding. As such, defendant concludes, the new parole statute does not offer a meaningful and realistic opportunity to obtain release based on demonstrated maturity or rehabilitation. Therefore, his 50-year *de facto* life sentence implicates *Miller* and *Holman* and, because it was imposed without a finding of permanent incorrigibility, violates the eighth amendment and this court's mandate. We disagree.

¶ 51 Preliminarily, although defendant argues that the parole system contradicts *Miller*, it is not clear that the parole system must even comply with *Miller*. Indeed, the Court has not specifically addressed whether the eighth amendment requires states to implement parole systems that provide

a meaningful opportunity to obtain release, or whether the eighth amendment is satisfied by simply allowing *eligibility* for parole to a juvenile who has been sentenced to life. See, *e.g.*, *Thomas v. Stitt*, No. 21-6011, 2022 WL 289661, \*3 (10th Cir. Feb. 1, 2022) (noting same); see also *Brown v. Precythe*, 46 F.4th 879, 885-86 (8th Cir. 2022) (*Montgomery* expressly requires only that states permit juvenile homicide offenders to be considered for parole; *Miller* factors apply only at *sentencing* and not to parole board procedures; those cases did not purport to direct courts to scrutinize whether parole procedures afford a meaningful opportunity for release of a juvenile homicide offender); *Bowling v. Virginia Department of Corrections*, 920 F.3d 192, 197-99 (4th Cir. 2019) (declining to find that juvenile eighth amendment protections (1) apply to juvenile homicide offenders sentenced to life *with* parole or (2) extend beyond sentencing, concluding that, even if *Graham* and *Miller* applied to parole proceedings, the defendant's parole proceedings met that standard, where the proceedings allowed the parole board to consider age at the time of the offense and evidence demonstrating maturation); *Heredia v. Blythe*, 19-cv-338-jdp, 2022 WL 16635179, \*\*8-9 (W.D. Wis. Nov. 2, 2022) (rejecting arguments by a class of prisoners that *Graham* set new requirements for parole; "Plaintiffs point to no suggestion in *Graham* or any other Supreme Court case that the Court was announcing a new standard for parole of juvenile offenders or using the phrases 'meaningful opportunity' and 'demonstrated maturity and rehabilitation' as terms of art for states and courts to apply under that new standard"; rather; *Graham* said only that a parole system is what gives an offender a meaningful chance to demonstrate growth and maturity, not that it intended to create new standards for considering parole applications); *contra*, *e.g.*, *Maryland Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, \*21 (D. Md. Feb. 3, 2017) (meaningful opportunity must also apply to parole proceedings; "it is quite unlikely that the requisite 'demonstrated maturity and rehabilitation' needed for release would be

evident at sentencing. To the contrary, such change would occur, if at all, after sentencing and during incarceration. And, to the extent that such change occurs, the vehicle to recognize it would be parole"). Where there is no constitutional or inherent right to parole proceedings (see, *e.g.*, *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7 (1979)[2]; *Hill v. Walker*, 241 Ill. 2d 479, 485-87 (2011)), and where the court in *Montgomery*, after considering *Graham* and *Miller*, said only that states may remedy *Miller* violations by providing juvenile offenders parole *consideration* (*Montgomery*, 577 U.S. at 211-12), it may be that defendant is receiving all the "meaningful opportunity" required simply by being *eligible* for parole.

¶ 52 Nevertheless, assuming that *Graham* and *Miller* do apply to parole processes, the Court in *Graham*, other than mentioning that the opportunity for release must be "realistic" and not just a "remote possibility" (*Graham*, 560 U.S. at 68, 70, 82), did not further define what a "meaningful opportunity" actually means or requires. See *Sanders v. Eckstein*, 981 F.3d 637, 643 (7th Cir. 2020) ("In time the Supreme Court may give more definition to what constitutes a 'meaningful

---

[2]In *Greenholtz*, the Court not only held that states are not required to establish parole systems, it thoroughly detailed that a state could be *general* in defining conditions for release and that a "multiplicity of imponderables" exists for decisionmakers to assess in their discretion. *Greenholtz*, 442 U.S. at 7-10. As such, the court noted in *Heredia* that it is, therefore, unlikely that *Graham* imposed additional constitutional requirements on parole processes, where it expressed no disagreement with the Court's "long-expressed understanding of the parole process" and did not even cite *Greenholtz*, rendering it "unreasonable to infer such a significant departure from settled law without clearer guidance from the Court." *Heredia*, 2022 WL 16635179, at *10.

opportunity' for early release."). Rather, the Court left that to the states. Specifically, the Court stated:

"A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for *the State*, in the first instance, to explore the means and mechanisms for compliance." (Emphasis added.) *Graham*, 560 U.S. at 75.

In Illinois, the legislative response to the requirement that there be available some meaningful opportunity for obtaining release was to extend parole eligibility to nearly all juvenile offenders. See 730 ILCS 5/5-4.5-115 (West 2020). The processes and conditions attached to that eligibility also fall *squarely* within the legislature's authority. *People ex rel. Kubala v. Kinney*, 25 Ill. 2d 491, 493-94 (1962) (parole is a part of the legislative function and "the legislature may change the terms and conditions for parole"); *Harris v. Irving*, 90 Ill. App. 3d 56, 62 (1980) ("it is clear that parole in Illinois is in the nature of a gift and as such, its conditions can be changed at the discretion of the legislature").

¶ 53    Not only has the legislature extended parole eligibility to juvenile offenders such as defendant, but it did so, we believe, by crafting terms that create a "meaningful opportunity" for release. Our supreme court in *Buffer* emphasized that, "when statutes are enacted after judicial opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law." *Buffer*, 2019 IL 122327, ¶ 35. Indeed, the court's holding in *Buffer* rested upon the presumption that, because the legislature enacted a juvenile sentencing provision after *Miller*, it had determined that the change *complied* with *Miller*. *Id.* ¶¶ 36-39. Here, too, we may presume that, because the legislature made changes to parole after *Miller*, it determined that those

changes *complied* with *Miller.* In fact, we need not make many presumptions, because legislative transcripts clearly reveal, as indicated by the following statements made during the legislative floor debate, that the new parole statute was enacted, after due consideration and debate, for the very purpose of complying with *Miller.*

"SENATOR HARMON:

*** House Bill 531 [2018 Ill. Legis. Serv. P.A. 100-1182 (H.B. 531)] reflects another significant criminal justice reform bill, also the product of a Session-long negotiation among critical stakeholders. I'm pleased to report we have an agreement on juvenile parole. We have not made all of the stakeholders proponents, but we have at least achieved neutrality. This bill continues our general response to the U.S. Supreme Court's decision in [*Miller*] that laid out the fundamental notion that juvenile offenders are simply wired differently and have a propensity, much more so than older offenders, to be rehabilitated. We are creating a—a parole system that would permit long sentences to be revisited at [10] years or [15] or [20] years *depending on *** the crime*." (Emphasis added.) 100th Ill. Gen. Assem., Senate Proceedings, May 31, 2017, at 30-31 (statements of Senator Harmon).

Thereafter, the floor opened for discussion, and various senators voiced questions and concerns, particularly about the seriousness of crimes, victims' rights, and empowering the Board. After debate, and before the bill passed, the discussion closed as follows:

"SENATOR HARMON:

*** I would like to close by pointing out that the opposition voiced on the Floor today is the exact reason this is a good bill and we should pass it. The Supreme Court—the U.S. Supreme Court's jurisprudence on youthful offenders is moving forward and is

relying upon the—the brain science of development. And the science of brain development suggests that young people don't reach the age of fully formed brains at eighteen or at twenty-one. It's not till the mid-twenties, so we're still a few years away from the—the brain science here. But to the point made, there is no judge on the planet who can look at a nineteen-year-old and say, I know for a fact that you're the kind of young person who is going to mature and rehabilitate in prison or you're the kind who is never going to get out of prison. That's why we create this parole process, so that [10] years or [15] years down the road, we can have a second look at the offender and say whether or not it's appropriate for them to be released. The Prisoner Review Board is in favor of this bill. The State's Attorneys Association is neutral. I'm hopeful that the Governor will sign it. To the concern over victims, a concern that I shared, victims were at the table. ***" 100th Ill. Gen. Assem., Senate Proceedings, May 31, 2017, at 35-36 (statements of Senator Harmon).

¶ 54 It is clear that the legislature, fully aware of *Miller* and the relevant considerations concerning juvenile sentencing and fully within its exclusive authority, created the new parole statute and modified the parole review factors for the purpose of creating a meaningful opportunity for parole for juvenile offenders.[3] We ultimately disagree with defendant's arguments that,

---

[3]Indeed, in his brief, defendant to some extent acknowledges this, as he notes that, in legislative debate, one representative commented that, while *Miller* concerned persons under age 18, the proposed bill "goes a little *further* than what the Supreme Court required." (Emphasis added.) 100th Ill. Gen. Assem., House Proceedings, Nov. 28, 2018, at 54 (statements of Representative Currie). Yet defendant turns into a negative the fact that the legislature went beyond *Miller*, implying that, because the revisions apply to juveniles and young adults, there is a resulting

nonetheless, the legislature got it wrong. Defendant acknowledges that, given his first degree murder conviction, requiring him to wait 20 years to first petition for parole is not out of step with other jurisdictions. However, he focuses on (1) the 10-year period he must wait between petitions (with only two opportunities to apply) as being unduly harsh, in light of other states' parole provisions, and (2) the factors the Board ultimately considers, which he believes are contrary to *Miller* because they do not mention the *Miller* factors, they include risk assessment tests that intrinsically disfavor juvenile offenders, and, irrespective of youth, include the seriousness of the offense as the determinative factor. We disagree.

¶ 55    First, to be sure, when considering whether punishments are constitutionally excessive, we look to currently prevailing standards of decency, as reflected in legislation enacted by our country's legislatures. *Buffer*, 2019 IL 122327, ¶¶ 15, 34. In that regard, we appreciate the purpose behind defendant's comprehensive review of other states' parole schemes. However, differences in states' procedures go both ways; as an example, while defendant here must serve 20 years before applying for parole, the waiting period in other states is *longer*. See, *e.g.*, Mo. Ann. Stat. § 558.047(1) (West 2016) (25 years); Wyo. Stat. Ann. § 6-10-301(c) (West 2013) (25 years). Certainly, parole statutes across the country may have differing terms and conditions, and, as long as the process is a meaningful one, state legislatures are free to decide their own priorities and parameters. Thus, while we may be sympathetic to defendant's argument that 10 years between petitions and only two opportunities to apply may be harsh, given that other jurisdictions do it

---

constitutional deprivation. We do not find persuasive defendant's argument that, by seeking to extend *Miller*'s protections broadly, the legislature created a scheme that results in his punishment being a cruel and unusual one.

differently, we nevertheless believe that the process *overall* remains meaningful, particularly as the new parole statute requires the Board to consider concerns implicated by *Miller* and its progeny.

¶ 56 Overall, the new parole statute provides that a defendant may begin the process of seeking release by filing a petition with the Board three years prior to becoming eligible. 730 ILCS 5/5-4.5-115(c) (West 2020). Within 30 days of receipt of the petition, the Board shall set a date for the parole hearing three years from the receipt of the petition or it must notify the defendant if the petition was insufficient, including a basis for that determination. *Id.* If the petition is appropriately filed, a representative from the Department of Corrections must meet with the defendant to discuss the process and make personalized recommendations regarding work, rehabilitative programs, and institutional programs, and the defendant may request programs be made available that he or she believes will help to prepare him or her for return to the community. *Id.* § 5-4.5-115(d). Nine months before the hearing, the Board must, with certain exceptions, provide the petitioning defendant and his or her counsel with any written documents or material it will consider in making its determination. *Id.* § 5-4.5-115(f). If parole is denied, the Board must provide to the defendant and his or her counsel a written decision stating its rationale for the denial, including the primary factors it considered. *Id.* § 5-4.5-115(*l*). A defendant petitioning for parole is entitled to be present at the hearing and may either hire counsel or be appointed counsel upon a finding of indigency. *Id.* § 5-4.5-115(e), (h). Notably, the new parole statute *explicitly* requires the Board to consider the *concerns* implicated by *Miller* and its progeny. For example, "[i]n considering the factors affecting the release determination under 20 Ill. Adm. Code 1610.50(b), the Prisoner Review Board panel *shall consider* the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." (Emphasis

added.) *Id.* § 5-4.5-115(j); see *People v. Guerrero*, 2022 IL App (1st) 210400, ¶ 33 (commenting, with respect to section 5-4.5-115(j), that "[t]hese considerations mirror those identified by the Supreme Court in *Miller*"). Further,

> "[i]f a psychological evaluation is submitted for the Prisoner Review Board's consideration, it shall be prepared by a person who has expertise in adolescent brain development and behavior, and shall take into consideration the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and increased maturity of the person." 730 ILCS 5/5-4.5-115(h) (West 2020).

Thus, while the periods between petition reviews for those convicted of first degree murder may be lengthy, the process reflects that the opportunity for release *requires* consideration of youth, demonstrated maturity, and rehabilitation and, therefore, it remains a meaningful one. See, *e.g.*, *Graham*, 560 U.S. at 75 (requiring a "meaningful opportunity to obtain release based on *demonstrated maturity and rehabilitation*" (emphasis added)); *Beck*, 2021 IL App (5th) 200252, ¶ 22 (not considering a first degree murder conviction and, therefore, considering a shorter time between parole petitions, but nevertheless finding that the new parole process *overall* is a meaningful one, in light of *Graham*'s rationale that, with an opportunity for parole, a defendant cannot ignore that he or she may *not* be imprisoned for life and, while release is not guaranteed, a defendant is not *entitled* to a guaranteed release; rather, he or she is entitled only to a meaningful opportunity to obtain release based on maturity and rehabilitation); see also *Brown*, 46 F.4th at 886-90 (even if the requirement to allow "some meaningful opportunity" for release applies to parole proceedings for juvenile homicide offenders, no violation where Missouri's parole statute, enacted in response to *Montgomery*, allowed for parole eligibility after serving 25 years; required the parole board to consider, among other things, the *Miller* factors in rendering a decision; and

afforded the offender advance notice of the parole review, an opportunity to be heard, including through a delegate that could be an attorney, an opportunity to submit documents and letters of support, and an interview).

¶ 57 Second, while at *sentencing* it may be improper for a court to consider risk assessment factors beyond a juvenile's control (*People v. Reyes*, 2023 IL App (2d) 210423, ¶ 43), at a petition review, the Board is charged with assessing whether the now-adult prisoner is prepared to return to society, and, in that sense, the risk factors are not irrelevant. Further, the Board must consider a myriad of factors (see 20 Ill. Adm. Code 1610.50 (1985)), which include a high severity or recidivism index (20 Ill. Adm. Code 1610.50(b)(2)(A)(xiii) (1985)), but it is certainly not limited thereto. Indeed, it must make base the decision on all relevant information. 20 Ill. Adm. Code 1610.50(a), (b) (1985). As such, the Board could, theoretically, in light of the juvenile offender's youth, weigh a risk assessment factor less, as well as recognize that, because the offender was incarcerated as a juvenile, aspects within that assessment, such as education, employment, and personal relationships, may have been interrupted.

¶ 58 Finally, defendant argues that the parole process is not meaningful because, irrespective of youth, the seriousness of the offense is the determinative factor. Again, we disagree. Section 5-4.5-115(j) provides three scenarios wherein the Board shall not parole an eligible person, with one being if "the eligible person's release *at that time* would deprecate the seriousness of his or her offense or promote disrespect for the law." (Emphasis added.) 730 ILCS 5/5-4.5-115(j)(2) (West 2020). However, this language does not necessarily detract from the Board's consideration of the factors of youth. Indeed, if the Board were to theoretically determine that maturity and rehabilitation had not been established, then it could reasonably find that release "at that time" would deprecate the seriousness of the offense. In fact, after listing the three scenarios where parole

should not be granted, the new parole statute next provides, as part of the same subsection, that, "[i]n considering the factors affecting the release determination under 20 Ill. Adm. Code 1610.50(b), the Prisoner Review Board panel *shall consider* the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." (Emphasis added.) *Id.* § 5-4.5-115(j). As such, we cannot accept defendant's assertion that the new parole statute renders the seriousness of an offense the determinative parole factor, irrespective of youth.

¶ 59 We feel obligated to note that we are certainly not suggesting that a parole hearing may operate as a sham. For example, if a juvenile offender has adequately demonstrated maturity and rehabilitation, denying parole based *solely* on the seriousness of the crime could indeed violate the principles behind *Miller* and *Graham*. But, at this juncture, we have no *basis* to anticipate that here. The new parole statute and procedures allow the Board to assess and weigh youth, its attendant circumstances, demonstrated maturity, rehabilitation, and *all* parole release factors in a manner or through a "lens" compliant with *Graham* and *Miller*. See, *e.g.*, *Bonilla v. Iowa Board of Parole*, 930 N.W.2d 751, 776-92 (Iowa 2019). In other words, nothing in the new parole statute or procedures prevents the Board from applying and weighing relevant factors in a manner consistent with the evolving authority concerning juvenile offenders, and, indeed, that is exactly what the legislature intended to do.

¶ 60 For the foregoing reasons, we decline defendant's invitation to determine that the new parole statute does not provide a meaningful opportunity for release, rendering unconstitutional his sentence. In short, when our legislature created the new parole statute, it was fully apprised of *Miller* and its mandates, as well as, presumptively, the processes used by other states. While we might be sympathetic to some of defendant's points, and hope the legislature reconsiders some

parole restrictions (particularly the lengthy period between petition opportunities and foreclosure of opportunities thereafter), it is the legislature's role to craft parole statutes and procedures and to determine what is meaningful. Here, it did so after due debate, much deliberation, and lengthy negotiations. It considered not only *Miller* and all of its implications, but also victims' rights, the seriousness of offenses (deliberately tailoring waiting periods for petitions based on the offense), and the proper factors to be considered within the Board's authority. In short, the new parole statute affords defendant a meaningful opportunity for release, based on his maturity and rehabilitation, before serving a *de facto* life sentence of over 40 years' imprisonment.

¶ 61          C. Permanent Incorrigibility and Proportionate Penalties

¶ 62    In an argument similar to that raised above, defendant argues that, where the court made no finding that he is permanently incorrigible, its decision to impose a *de facto* life sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Defendant argues that, under *Jones*, states remain free to impose additional sentencing restrictions for juveniles beyond those that might be required by the eighth amendment. See *Jones*, 593 U.S. at ___, 141 S. Ct. at 1323. Defendant asserts that the proportionate penalties clause offers greater protection to defendants than the eighth amendment, and he further summarizes this state's jurisprudence reflecting evolving standards of decency for juvenile sentencing, particularly as those principles were summarized in *Holman*. See *Holman*, 2017 IL 120655, ¶¶ 44-46. Accordingly, defendant contends, *Holman*'s holding (again, which, before being overruled, required a finding of permanent incorrigibility prior to the imposition of a life sentence without parole), while indisputably based on the eighth amendment, was also rendered after weighing evolving standards of decency and proportionality considerations. Defendant supports this argument by again citing *Griffin*, noting comments in that decision about *Holman*'s reasoning and

its conclusion that *Holman*, although decided under the eighth amendment, set a minimum for our own proportionate penalties clause and remains good law. See *Griffin*, 2021 IL App (1st) 170649-U, ¶ 87 (Gordon, J., specially concurring). Accordingly, defendant asserts that *Holman*'s prohibition against imposing a life sentence on a juvenile offender without first making a finding of permanent incorrigibility applies under the proportionate penalties clause; thus, because the trial court here did not make an incorrigibility finding, we should conclude that his sentence violates Illinois's evolving standards of decency, the proportionate penalties clause, and this court's prior mandate.

¶ 63    We review *de novo* whether a sentence violates the proportionate penalties clause. See, *e.g.*, *Johnson*, 2018 IL App (1st) 140725, ¶¶ 97-98. For the following reasons, we reject defendant's claim.

¶ 64    Again, *Holman*'s requirement that there be a permanent-incorrigibility finding has now been overruled. *Wilson*, 2023 IL 127666, ¶ 42. Moreover, setting aside that *Griffin* is unpublished and, therefore, not precedential on this issue (see Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021)), we note, with all due respect, that the comments upon which defendant relies were made by the specially concurring justice and did not, therefore, necessarily reflect the views of the court majority. Further, those comments were made in the context of the justice considering *Jones*'s impact on *Holman* and *Buffer*.[4] See *Griffin*, 2021 IL App (1st) 170649-U, ¶¶ 87-88. As such, it is presently

---

[4]We also note that, although the special concurrence also elaborated upon the sentence that the trial court might impose on remand, reiterating that life or *de facto* life may be imposed only if the trial court were to find permanent incorrigibility, it did *not* address the applicability or possibility of parole under the new parole statute, a question that had been raised by the majority.

not the time for us to determine whether we agree with those comments, because, irrespective of *Jones*, we have concluded that defendant's sentence, despite the absence of a finding of permanent incorrigibility, does not violate *Holman*, which concerned juvenile offenders who are sentenced to life *without* parole. As noted recently by our sister court, "[w]hether raised under the eighth amendment or the proportionate penalties clause, a juvenile defendant must make the same threshold showing: his or her sentence is a life sentence or *de facto* life sentence. The constitutional source of the claim is irrelevant to this preliminary inquiry." *People v. Hill*, 2022 IL App (1st) 171739-B, ¶ 42. We have already concluded that defendant has not, in fact, been sentenced to life without parole or the equivalent of life without parole, because he is *eligible for parole* before serving the equivalent of a life sentence. As such, even if, theoretically, *Holman*'s requirement for an incorrigibility finding had remained valid, and a failure to issue one might have violated the proportionate penalties clause, there would be no such violation *here* by the sentence imposed upon defendant, as he will have two meaningful opportunities to seek release prior to serving more than 40 years' imprisonment. In sum, we reject defendant's argument that the court's failure to make a finding of permanent incorrigibility renders his sentence in violation of the proportionate penalties clause.

¶ 65                              D. Trial Court's Findings

¶ 66    Defendant next contends that his sentence violates both the eighth amendment and the proportionate penalties clause because the trial court's findings contradicted *Miller*, were incompatible with Illinois law and evolving standards of decency, and were simply improper, requiring reversal. Specifically, defendant recounts the evidence presented at the sentencing

---

See *Griffin*, 2021 IL App (1st) 170649-U, ¶¶ 68, 90-99.

hearing reflecting his rehabilitative potential, including his educational progress while incarcerated, his statement in allocution expressing remorse and demonstrating personal growth, and Dr. Garbarino's report, finding that he possesses rehabilitative potential. Although the trial court acknowledged defendant's rehabilitative potential, as well as that defendant experienced peer pressure at the time he committed the crime, it nevertheless sentenced defendant to a 50-year term. Defendant argues that, per *Miller* and its progeny, his sentence is not justified or permissible because he is not one of the rarest of juvenile offenders who is forever incapable of rehabilitation. As such, defendant argues that we should find that his sentence is unconstitutional under the eighth amendment and the proportionate penalties clause.

¶ 67    Again, we review *de novo* whether a sentence violates the eighth amendment or the proportionate penalties clause. See, *e.g.*, *Johnson*, 2018 IL App (1st) 140725, ¶¶ 97-98. We conclude that the sentence here violates neither constitutional provision.

¶ 68    As the State notes, to trigger *Miller*, such that the trial court's findings here could even contradict it, defendant must be sentenced to life without parole. He was not. As such, his sentence is not properly considered in the constitutional framework he sets forth. See, *e.g.*, *Hill*, 2022 IL App (1st) 171739-B, ¶ 42 (noting that constitutional *Miller* claims first require a threshold showing of a life sentence or a *de facto* life sentence).

¶ 69    Further, even if defendant had been sentenced to life without parole, *Miller* requires that, before imposing such a sentence, a trial court must consider youth and its attendant circumstances. *Miller*, 567 U.S. at 483, 489. Again, Illinois has codified those factors, which must be considered when sentencing a juvenile. See 730 ILCS 5/5-4.5-105(a) (West 2016). Defendant does not argue that the court here did not consider the *Miller* factors or section 5-4.5-105(a)'s provisions. Rather, he disagrees with the length of the sentence imposed *after* the court considered those factors and

provisions, and, in effect, the weight the court gave them. Accordingly, defendant's argument, while cast in a constitutional framework and as a variation of a *Miller* violation, really asks us to consider whether the sentence is simply excessive. We now turn to defendant's excessive-sentence argument.

¶ 70                                              E. Excessive Sentence

¶ 71    Finally, defendant argues that, apart from any constitutional concerns, his 50-year sentence is excessive, given his youth at the time of the offense and his potential for rehabilitation. He contends that the court misunderstood some of the mitigating factors delineated in section 5-4.5-105(a) or improperly treated them as aggravating. Defendant does not dispute that his sentence is within the statutory sentencing ranges, but he notes that the court imposed 50 years, more than double the minimum for first degree murder.

¶ 72    Further, defendant heavily relies on *Hill*, 2022 IL App (1st) 171739-B, where the appellate court reversed as excessive, in light of the "deluge" of evidence of rehabilitation, a juvenile defendant's 60-year sentence for acting as the shooter in two gang-related murders. *Id.* ¶¶ 44-50. Defendant notes that, although the court in *Hill* concluded that the defendant's sentence did not violate *Miller*, the eighth amendment, or the proportionate penalties clause, it nevertheless found the sentence excessive, where the sentencing court did not sufficiently consider evidence of rehabilitation. Here, likening his case to *Hill*, defendant notes that he, too, was a juvenile at the time of the gang-related offense, was found to have personally discharged the firearm, and was influenced by peer pressure. Further, he notes that he submitted to the court a report from Dr. Garbarino, who, like the expert who testified in *Hill*, opined that defendant had suffered adverse childhood experiences that impacted his development but that he had since matured, was not irreparably corrupt, had taken a decidedly positive direction in his adult development, and was

well-positioned to transition from prison to success in the outside world. Defendant argues that, despite those findings, as well as the evidence of his educational achievements and growth while incarcerated, the court placed substantial weight instead on the circumstances of the offense and his role as the shooter. Defendant concludes that, where the sentence in *Hill* (*i.e.*, 60 years, but only 30 years with day-for-day credit) was found excessive, even though the defendant there murdered two victims, defendant's sentence here, where he will serve 45 years with sentencing credit, is likewise excessive, particularly given the evidence in mitigation and regarding his capacity for rehabilitation. We disagree.

¶ 73     We review for an abuse of discretion a trial court's sentencing decision. See, *e.g.*, *People v. Maldonado*, 240 Ill. App. 3d 470, 485 (1992). The sentencing court has wide latitude in imposing a sentence, so long as it does not ignore relevant mitigating factors or consider improper aggravating factors. See, *e.g.*, *People v. Hill*, 2022 IL App (2d) 200416, ¶ 51. We accord "great deference to a sentence within the appropriate sentencing range." *Id.* However, we will find that a court abused its discretion, even if the sentence imposed is within the statutory range, if the sentence does not reflect adequate consideration of relevant mitigating factors or the constitutionally mandated objective of rehabilitation, or if it is highly disproportionate to the offense and greatly diverges from the spirit and purpose of the law. See, *e.g.*, *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). However, while a sentencing court must consider a defendant's rehabilitative potential, along with the seriousness of the offense, it is not required to give rehabilitative potential greater weight. See *People v. Alexander*, 239 Ill. 2d 205, 214 (2010).[5] We

---

[5]We disagree with defendant that this principle from *Alexander* should be reconsidered because it predated much of the juvenile-sentencing law that is relevant here.

may not substitute our judgment for that of the sentencing court simply because we would have weighed the factors differently. See *Hill*, 2022 IL App (2d) 200416, ¶ 51.

¶ 74   Here, defendant received the lowest available sentence for first degree murder, as the court imposed the minimum 20 years and did not impose the firearm enhancement. See 730 ILCS 5/5-8-1(a)(1)(a) (West 2006); *id.* § 5-8-1(a)(1)(d)(iii); 730 ILCS 5/5-4.5-105(b) (West 2016). For attempted murder, the court imposed 10 years, which was 4 years above the minimum, but 20 years below the maximum, sentence for that offense. See 730 ILCS 5/5-8-1(a)(3) (West 2006). Because defendant personally discharged a firearm during the offense, the court elected to impose the 20-year firearm enhancement. See *id.* § 5-8-1(a)(1)(d)(ii); 730 ILCS 5/5-4.5-105(b) (West 2016). In essence, therefore, defendant is alleging that the court abused its discretion by imposing four years more than the minimum on the attempted murder and imposing one of the two available firearm enhancements. We disagree, as we will not deem a sentence within the statutory limits excessive unless manifestly disproportionate to the nature of the offense, nor will we reweigh the sentencing factors. See, *e.g.*, *Stacey*, 193 Ill. 2d at 210; *People v. Powell*, 2013 IL App (1st) 111654, ¶ 31.

¶ 75   The trial court here methodically considered each mitigating factor required by section 5-4.5-105(a) of the Code. We believe that, contrary to defendant's assertion and unlike the court in *Hill*, the trial court here gave due weight and consideration to defendant's rehabilitative potential. Unlike in *Hill*, the court here did not essentially ignore a "deluge" of expert testimony. Rather, it expressed that it had read Dr. Garbarino's report "word-for-word." We agree with defendant that the evidence of his efforts and actions taken while incarcerated is laudable, but it was also acknowledged as such by the court. The court expressly noted defendant's efforts, as well as the fact that he had virtually no serious infractions during the roughly 13 years he had been imprisoned,

and it explicitly found that defendant had rehabilitative potential. Further, the court recognized that defendant was a juvenile, albeit an older adolescent at the time of the offense, and that, as a gang member, he had been under the influence of peer pressure. Indeed, the court found that, given the evidence in mitigation, the record provided no justification for it to increase defendant's sentence from that originally imposed and, where it declined to add a 25-year firearm enhancement to the first degree murder sentence, the court decided in its discretion to impose a sentence *lower* than that originally imposed.

¶ 76    Similarly, we find no abuse of discretion in the court's expressed rationale and weighing of factors in making the decision to leave intact the originally imposed 10 years for the attempted-murder conviction and for imposing, in its discretion, the 20-year firearm enhancement. As the court noted, defendant's use of a firearm in this case, totally unprovoked by the victims, resulted in four bullets striking two young people on a sidewalk in Aurora; three killing a young man and the fourth injuring his girlfriend. It explained,

> "[t]his wasn't one bullet. This was four bullets. This wasn't one victim. This was two victims. Had there not been a gun in this case, we would not have a victim most likely. ***
> [H]ad a gun not been involved *** we probably don't have four bullets flying around the City of Aurora and two people being shot, one fatally."

The court was not obligated to ignore that, after the shooting, defendant took pride in the event, changed his nickname, and obtained a tattoo in honor of his actions. On balance, however, the court recognized that defendant did not remain proud of his actions, which speaks to his rehabilitative potential. We do not agree with defendant that the court placed undue weight on his role as the shooter, his age as an "older adolescent," or the need for deterrence. Rather, in our view, the court simply made findings and acknowledged facts. It found "horrific" the circumstances of

the offense, but the court is not required to turn a blind eye to these circumstances in fashioning a sentence. To the contrary, it is required to consider the circumstances of the offense. See 730 ILCS 5/5-4.5-105(a)(5) (West 2020). In doing so, however, it did not ignore relevant factors in mitigation.

¶ 77    In sum, after considering and giving due weight to defendant's youth at the time of the offense and all mitigating and aggravating evidence, the court did not abuse its discretion in fashioning defendant's 50-year sentence, with 45 to be served after accounting for sentencing credit and with an opportunity for parole after defendant serves 20 years.

¶ 78                                III. CONCLUSION

¶ 79    For the forgoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 80    Affirmed.

¶ 81    JUSTICE SCHOSTOK, specially concurring:

¶ 82    I agree with the majority's analysis in this case, including its conclusion that the defendant has not shown that the new youth parole statute is constitutionally inadequate, and thus the defendant's sentence is not contrary to the holdings of *Miller* and *Holman*. I write separately to clarify the differences between this case and our recent decision in *Reyes*, 2023 IL App (2d) 210423, and to note that this case in no way condones or excuses a trial court's failure to follow our mandate.

¶ 83    The first way the two cases are distinguishable is in the nature of the issues addressed. *Reyes* followed the principle that we must avoid addressing constitutional arguments if the case can be resolved on other grounds. *Id.* ¶ 34. There, errors in applying the sentencing statutes required reversal, without addressing constitutional arguments. See *id.* ¶ 54. In this case, by contrast, the only issues raised were ones of constitutional interpretation, requiring us to address

those issues. We ultimately find the defendant's constitutional arguments flawed. Our conclusion here is not inconsistent with *Reyes*, as we might have reached the same conclusion there if we had occasion to address constitutional issues.

¶ 84    The second way in which the two cases differ is in the trial courts' compliance with our mandate. Here, the trial court recognized our instruction that it could not again impose a *de facto* life sentence unless it found the defendant permanently incorrigible while also recognizing that that mandate flowed from the requirements of *Holman*, 2017 IL 120655, ¶ 46. *Holman* stated that command more completely, specifying that "a juvenile defendant may be sentenced to life imprisonment *without parole* *** only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." (Emphasis added.) *Id.* The trial court thoughtfully considered the defendant's rehabilitative potential, finding that the defendant was not permanently incorrigible. The trial court also properly considered the sentencing factors specific to youthful offenders. However, the trial court also considered and ultimately agreed with the State's argument that the new youth parole statute would apply and thus the defendant's new sentence, regardless of its length, would not be a sentence of "life imprisonment without parole." We agree with that assessment. Under these circumstances, the trial court's sentence did not violate our mandate. See *supra* ¶ 47.

¶ 85    In *Reyes*, by contrast, the trial court expressly rejected our mandate, refusing to make any finding at all regarding permanent incorrigibility—either positive or negative. That decision was not based on the availability of the new youth parole statute, or on *Wilson*, 2023 IL 127666, ¶ 42, which had not yet been decided. Instead, as justification for its refusal to make any finding, the trial court improperly claimed for itself the authority to decide whether an Illinois supreme court

decision (*Holman*) was still good law, despite an explicit statement from the United States Supreme Court that it was not overruling state court decisions (see *Jones*, 593 U.S. at ___, 141 S. Ct. at 1323), so the supremacy clause did not apply. In large part because of this improper refusal to comply with our mandate, we instructed that the case be reassigned on remand. As we noted in *Reyes*, trial courts are not empowered to decide for themselves whether to comply with the mandates of superior courts. *Reyes*, 2023 IL App (2d) 210423, ¶ 57.

¶ 86     No similar refusal to comply with our mandate was demonstrated by the trial court here. Accordingly, *Reyes* is distinguishable from this case.

***People v. Cavazos*, 2023 IL App (2d) 220066**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 08-CF-3321; the Hon. Donald Tegeler Jr., Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Katie Anderson, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |