2024 IL App (2d) 230222-U
No. 2-23-0222
Order filed July 29, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03-CF-256 |
| MATTHEW A. QUIGLEY, | ) ) | Honorable T. Clinton Hull, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court did not abuse its discretion in resentencing defendant to an aggregate term of 80 years' imprisonment where defendant was found guilty of two separate counts of first-degree murder and the trial court properly took into consideration defendant's youth and its attendant characteristics during resentencing. Affirmed.

¶ 2     Defendant, Matthew A. Quigley, appeals the July 5, 2023, order resentencing him to an aggregate sentence of 80 years. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The record in this case is voluminous. We will summarize only the facts and the procedural history that are relevant to the issue on appeal.

¶ 5      On March 18, 2003, defendant was charged via indictment with four counts of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2002)), each a Class M Felony. These charges stem from two separate incidents wherein defendant discharged a firearm and killed an individual. Counts I and II were severed from counts III and IV.

¶ 6      Count III proceeded to jury trial on January 29, 2007. Prior to trial, the State dismissed count IV. At trial, the State introduced evidence that on November 17, 2002, defendant was a "shortie" (a low ranking gang member) in the Insane Deuces gang. He was at a friend's house when Fernando Delatorre, a higher-up member of the Insane Deuces gang, told defendant to be waiting outside with the "strap" (gun). Another gang member and Delatorre picked up defendant in a silver PT Cruiser and drove about a block away, where Delatorre pointed out a "flake" (member of a rival gang, the Latin Kings) walking on Woodruff Street in Aurora, Illinois. The "flake" was 15-year-old Erbel Valdez. Delatorre instructed defendant to "run up and shoot that kid." Defendant was dropped off on Superior Street, around the corner from Valdez. Defendant ran southbound on Woodruff Street to catch up to Valdez. Once defendant caught up, he engaged Valdez in conversation and continued walking southbound towards Liberty Street. Defendant did not shoot Valdez immediately on contact because there was an older man doing yard work and defendant did not want him to see or to be accidentally hit. Once they were out of sight of any witnesses, defendant fired at Valdez five or six times, ultimately killing him. Defendant stashed the gun in his backyard, which was recovered by police officers in the course of their investigation. Defendant also made a statement to the police that was introduced at trial confessing to the crime.

¶ 7      The jury ultimately found defendant guilty of first-degree murder, as charged in count III of the indictment. It also found that defendant had personally discharged a firearm during the murder. After reviewing a Pre-Sentence Investigation (PSI) report and two victim impact

statements, the trial court sentenced defendant to 39 years' imprisonment, plus the then-mandatory 25-year add-on for personally discharging a firearm during the murder.

¶ 8    Counts I and II proceeded to bench trial on May 21, 2007. At trial, the State introduced evidence that on October 16, 2002, defendant and two other members of the Insane Deuces went driving around in search of a member of the Latin Kings to kill. As they were driving, they saw an individual in a hooded sweatshirt standing outside of the residence at 212 Jefferson Street in Aurora, Illinois. That individual was David Diego Garcia-Morales. Defendant began shooting at Garcia-Morales, who then ran into the backyard. Defendant shot Garcia-Morales nine times in total, ultimately killing him. After the shooting, defendant went back to his home and "chilled" with two of his fellow gang members. He ultimately made a confession to the police that was introduced at trial.

¶ 9    The trial court found defendant guilty of first-degree murder, as charged in count I and II of the indictment. Count II merged into count I. The trial court also found that defendant had personally discharged a firearm during the murder. Prior to sentencing, the trial court reviewed the PSI report and ultimately sentenced defendant to natural life imprisonment, as was required by statute at the time. See 730 ILCS 5/5-8-1(a)(1)(c)(i) (West 2006).

¶ 10   Defendant filed direct appeals, arguing that his statements to the police should have been suppressed at both trials because they were not made voluntarily. We affirmed. *People v. Quigley*, Nos. 2-07-0974 & 2-07-1225 (consolidated) (unpublished order filed under Supreme Court Rule 23(b)). Defendant then filed his first postconviction petition on July 8, 2013, alleging that under the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), the mandatory natural life sentence imposed on count I was unconstitutional.  Defendant's petition was advanced to the second stage of proceedings and counsel was appointed. Before counsel could

file an amended petition, the parties agreed that defendant would be resentenced to the minimum sentence of 20 years, plus the then-mandatory 25-year add-on for personally discharging a firearm during the offense. Defendant was resentenced on count I in accordance with that agreement and he withdrew his petition.

¶ 11    On January 6, 2020, defendant filed a motion for leave to file a successive post-conviction petition. In his motion, he argued that in light of the Illinois Supreme Court's holding in *People v. Buffer*, 2019 IL 122327, his sentence must be vacated and a new sentencing hearing conducted to allow the trial court to consider the *Buffer* factors. The State agreed, and defendant's sentence was accordingly vacated.

¶ 12    The matter proceeded to resentencing hearing on October 27, 2022. In addition to the court file, the trial court also reviewed, among other things, the PSI report; defendant's psychological evaluation report prepared by Dr. Oliverio on July 21, 2022; four mitigation letters; and a report from Dr. Garbarino. These will be summarized below.

¶ 13    The PSI report outlined defendant's criminal history, which included a misdemeanor and two ordinance violations. It also discussed defendant's behavior while imprisoned. Since being incarcerated, defendant had received a couple of petty write-ups. For the most part, defendant's behavior while imprisoned was satisfactory. In terms of defendant's personal history, he grew up in an intact household and lived with his mother, father, three older sisters, and older brother. During his childhood, defendant's father drank frequently and his mother would discipline him and his siblings with a big wooden paddle. Defendant's brother was killed in 2000, which led him to join the Insane Deuces. Up until his brother's death, defendant reported that he was a quiet, "nerdy" kid. He also reported that he attempted suicide between the ages of eight and ten. After his brother's death, defendant reported that he dropped out of school and had a very indifferent

attitude towards life, indicating that he thought he would die and was content with it. Since being incarcerated, defendant obtained his GED, renounced his gang affiliation (as a result of his sister asking him to), and gained employment working in the General Store on site. At the time of the PSI report, defendant reported having a good relationship with two of his three sisters, and had good relationships with his parents at the time of their deaths. The PSI report also included a statement from defendant:

> "I just wanted to say there is nothing I can say or do that will make up for my actions of the past. I wish that I had made better choices in my past, but the truth is that I did not and now I am in the position that I am in.

> The only thing that I can think to do is to fix the person that I used to be so that I never repeat my past mistakes. I am very sorry for my actions that have caused so much pain and suffering. I can only say that I am deeply ashamed of the person that I used to be. It is my hope that I can become the type of person that I should have been, instead of the person that I was.

> I have tried to distance myself from the people that I used to associate with and I am trying to interact with different types of people. I have recently started taking Anger Management Classes that were just made available at the prison that I am in. Although I do not believe I have anger problems, if it will help me to identify any issues that I may have so that they may be fixed, then it will be worth trying.

> Thank you for this opportunity to express regret and Apologize for my actions and the person I used to be."

The PSI report noted that defendant "appear[ed] to have been suffering from some level of depression for most of his life***. He expressed no hope for the future and stated that he does not see a purpose for his life." The PSI report concluded with defendant's ARA-CST (Adult Risk Assessment Community Supervision Tool[1]) score. Defendant scored a 21, which placed him at a moderate risk to reoffend.

¶ 14   The psychological evaluation was conducted on May 17 and 18, 2022, with the report being completed on July 21, 2022. The report specifically discussed the juvenile sentencing factors. See 730 ILCS 5/5-4.5-105 (West 2022). Notably, that at the time of the offense, defendant likely had a level of maturity that was greater than those his age and that defendant had on several other occasions shot a firearm at an occupied vehicle, though he was not charged with any offenses stemming from those occasions. In terms of defendant's rehabilitative potential, the report indicated that defendant distanced himself from gang involvement in 2012 and had minimal disciplinary history in IDOC. The report concluded by stating:

> "Overall, records indicate that since his confinement to IDOC, [defendant] has not demonstrated a life-course pattern of persistent, serious offending. *** [H]is decision to distance himself from other antisocial peers in a prison environment, pursue employment within the institution, and avoid incurring more criminal/disciplinary problems likely reflects the desistance of offending that is typically observed amongst juvenile offenders over time and indicates his efforts at some form of rehabilitation of his behavior."

¶ 15   Defendant's IDOC supervisor, defendant's nephew, and two of defendant's older sisters submitted mitigation letters in support of defendant. His IDOC supervisor noted that he felt

---

[1] ARA-CST is used to determine the likelihood of a defendant to reoffend. It uses information from official records, collateral contacts, and defendant's own self reporting.

strongly that defendant would be a productive member of society upon release and would have no concerns recommending defendant for early release. Defendant's nephew said that despite defendant's incarceration, defendant still remained an active and integral part of the family, providing him with advice and support. His sisters emphasized how much defendant had matured while incarcerated and how remorseful he was for his actions. They both indicated that they would be there to support defendant upon his release.

¶ 16    Dr. Garbarino, a doctor with "Consulting in Child and Adolescent Development", reviewed Dr. Oliverio's psychological evaluation report and the PSI report and created a supplemental report "to complement and extend" Dr. Oliverio's report. Dr. Garbarino noted that defendant developed a "war zone mentality" due to witnessing high levels of community violence as a child. According to Dr. Garbarino, this mentality explained defendant's lack of expressed remorse for his victims at the time of the incident, as well as explained defendant's adolescent violence.

¶ 17    At resentencing, the State argued that defendant should receive, at minimum, the same sentence as previously imposed—64 years for count III and 45 years for count I. The State also argued that the trial court was not limited to 45 years for count I, as that sentence was the result of what was essentially a plea deal (see *supra* ¶ 10). The State then went on to argue that the trial court was not required to make a separate finding that defendant is "one of the rarest juvenile offenders who is beyond rehabilitation" because defendant was eligible for parole after 20 years under 730 ILCS 5/5-4.5-115 (West 2022) and would therefore not be sentenced to a *de facto* life sentence. Finally, the State concluded by arguing that the evidence presented by defendant had little mitigation value and that defendant should receive the same sentence as was previously imposed because, notwithstanding the mitigating factors, the murders were not the result of impulsive youthfulness; rather, they were the result of cold, calculated acts by defendant.

¶ 18    Defense counsel responded by arguing that he should be sentenced to terms of 20 years' imprisonment for each count, to be served concurrently. Defense counsel also discussed the factors in aggravation and mitigation, conceding that the fact that defendant's conduct caused or threatened harm, the sentence is necessary to deter others from committing the same crime, and that the defendant committed an offense related to activities of an organized gang were all aggravating factors. In mitigation, defense counsel emphasized that defendant had little criminal history and was law-abiding for a substantial period of his life. Also, defense counsel argued that defendant is unlikely to reoffend, due to defendant's maturation and rehabilitation over the 20 years he was incarcerated. Defense counsel concluded by discussing the juvenile sentencing factors, which counsel argued demonstrated that defendant is "nowhere near irreparably corrupt but, in fact, reflect the transient immaturity of youth that was going on during this time, and he was heavily affected by a terrible situational occurrence, which is the murder of his brother."

¶ 19    At the close of arguments, the trial court took the matter under advisement and continued the case for resentencing. On February 3, 2023, the trial court resentenced defendant to 55 years on count I, the count that originally went to bench trial (30 years plus the 25-year add-on for personally discharging a firearm during the offense), to run consecutively with the 35 years imposed on count III, the count that originally went to jury trial. In imposing this sentence, the trial court indicated that it had taken into consideration the evidence received from the original trials, the transcripts from both trials, the PSI reports, the financial impact of incarceration, all factors in aggravation and mitigation (including the Kane County Diagnostic Center report, the IDOC disciplinary card, a letter from defendant's IDOC supervisor, a letter from defendant's nephew, a letter from two of defendant's older sisters, an expert report from Dr. Garbarino), and the juvenile sentencing factors pursuant to 730 ILCS 5/5-4.5-105 (West 2022). In making its

ruling, the trial court stated as follows, after an exhaustive analysis of all factors in aggravation and mitigation:

"The Court read [defendant's written statement] multiple times, and I considered that apology to be genuine and reflective of somebody who has been in prison for 20 years and had a chance to reflect upon a lot during that 20 years.

*** [D]uring the 20 plus years in the county jail and prison, he has taken actions that are consistent with a person who is trying to better himself. He has received just three disciplinary tickets in those 20 years. He has worked a number of jobs within the system making an impact on his supervisor, and he has maintained contact and relationships with his family members. He renounced his gang member[ship] in the Insane Deuces, and the evidence that I have just outlined suggests his potential for rehabilitation. So those are all factors that I have weighed significantly.

At the same time, The Court has the ability and does make the following findings: *** First of all, the date on which the defendant murdered David Garcia-Morales, he was 17 years and four months. On the date that he murdered Erbel Valdez, he was 17 years and five months. As I have said, just months away from being 18 and an adult.

Second, the defendant had the benefit of having an intact family with his mom, his dad, a grandmother, and older siblings, which provided support for him. The family wasn't perfect. No family is. But the evidence presented showed that he did have family members that were involved in his life. ***

***

Third, The Court finds the decision of the defendant to disobey a gang member's order to shoot a good friend to be particularly relevant and impactful. Again, the defendant

reports he was ordered to shoot a person that he identified as a good friend. *** He chose to disobey the order. He was aware that he was subjected to a beating by disobeying that order; and despite that, he still disobeyed the order. The conscious decision shows the defendant had the intellect and the maturity to understand the rank of the gang. He understood the order. He understood the consequence of disobeying that order, and he made the decision to disobey the order because he did not want to commit that offense.

Contrast that with the two murders that occurred. Similar situations in both murders. He was told they were going to go out and hunt down rival gang members. He was told he was the one to do the shooting. Yet, unlike when he disobeyed the order to shoot his good friend, he chose to do the shootings. It was a conscious decision, a reflective decision, one that demonstrates he was able to weigh the orders, the actions, and in those two cases made the decisions to do the shootings.

Finally, the circumstances of each offense and the participation in each role is troubling. He was the shooter in both instances, approached the victims just feet away, victims unarmed, victims just going about their day. They had done nothing wrong. After pulling the gun, they had enough time to figure out what was going on, to try to run away, and he shot both victims in a close distance in the back shooting them multiple times."

¶ 20 Defendant filed a motion to reconsider the sentence on February 16, 2023, which was partially granted on July 5, 2023. Defendant's sentence on count I, the count that originally went to bench trial, was reduced to a total of 45 years (20 years plus the 25-year add-on for personally discharging a firearm during the offense), so as not to exceed the sentence previously imposed, meaning defendant was sentenced to a total of 80 years. This timely appeal followed.

¶ 21                                          II. ANALYSIS

¶ 22    As a beginning note, defendant incorrectly lists Judge John A. Barsanti as the judge presiding in both his opening brief and his reply brief. The State correctly lists Judge T. Clint Hull as the judge presiding but makes no effort to correct defendant's error. We urge counsel to correctly identify the judge presiding in future briefs.

¶ 23    On appeal, defendant concedes that the trial court complied with the procedural requirements of *Buffer*, 2019 IL 122327. Defendant argues instead that despite this compliance, the trial court nonetheless abused its discretion in resentencing defendant to an aggregate term of 80 years' imprisonment, which he characterizes as a *de facto* natural life term. We disagree.

¶ 24    Although the issue is non-dispositive, we will briefly address defendant's claim that he was sentenced to a *de facto* natural life term. The Illinois Supreme Court in *Buffer* concluded that "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment." *Buffer*, 2019 IL 122327, ¶ 41. This court, in *People v. Cavazos*, 2023 IL App (2d) 220066, further clarified that where a defendant is eligible for parole after serving 20 years' imprisonment, the sentence does not constitute a *de facto* natural life sentence and accordingly does not violate Miller. *Id.* ¶ 60. Here, pursuant to 730 ILCS 5/5-4.5-115(b), defendant is eligible for parole review after serving 20 years or more of his sentences. Because defendant has a meaningful opportunity for release by virtue of the juvenile parole provisions, his aggregate sentence of 80 years' imprisonment does not constitute a *de facto* natural life sentence.

¶ 25    Turning now to defendant's principal claim: that the trial court abused its discretion in resentencing defendant to an aggregate term of 80 years imprisonment. A reviewing court will not disturb a sentence within the statutory range for an offense unless the trial court abused its discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). A sentence will be deemed an abuse

of discretion where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010) (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). Great deference is given to the trial court's sentencing decision, as it "is in the best position to observe the defendant and the proceedings, and it has the opportunity to weigh the relevant sentencing factors, such as the defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age." *People v. Campos*, 2024 IL App (2d) 230056, ¶ 48. We will not substitute our judgment for that of the trial court, simply because we would weigh the factors in aggravation and mitigation differently. *Id.* Further, a sentencing court is not required to give rehabilitative potential greater weight than other considerations, such as the seriousness of the offense. *Cavazos*, 2023 IL App (2d) 220066, ¶ 73.

¶ 26     In support of his argument, defendant states that the record establishes that defendant has been rehabilitated and restored to useful citizenship, and accordingly, the trial court's sentence within the statutory range was an abuse of discretion, despite complying with the requirements of *Miller* and its progeny. The State counters this by arguing that the trial court thoroughly considered all juvenile sentencing factors, including the nature and circumstances of the offenses, defendant's youth and its attendant circumstances, and defendant's rehabilitative potential. We agree with the State—defendant's argument amounts to nothing more than a request for this court to improperly reweigh the sentencing factors in aggravation and mitigation. We decline to do so.

¶ 27     Defendant claims that the sentence imposed was excessive because it was "greatly at variance with the spirit and purpose of the law." *People v. Mauricio*, 2021 IL App (2d) 190619, ¶ 33. He goes on to explain that the spirit and purpose of criminal sentencing in Illinois is outlined by the Proportionate Penalties Clause of the Illinois Constitution. Specifically, that a sentence

"shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. Art. I, § 11. Defendant claims that the sentence fashioned was excessive, as the evidence presented at the resentencing hearing demonstrated that defendant had already been restored to useful citizenship. Although that is true, that does not do away with the requirement that a sentence be determined "*both* according to *the seriousness of the offense* and with the objective of restoring the offender to useful citizenship." (Emphasis added.) ILL. CONST. ART. I, § 11. Important to note again is that a sentencing court is not required to give rehabilitative potential greater weight than other considerations, such as the seriousness of the offense. *Cavazos*, 2023 IL App (2d) 220066, ¶ 73.

¶ 28    Defendant's rehabilitative progress does not negate the atrocity of the crimes he committed. As the trial court noted, "[Defendant] was the shooter in both instances, approached the victims just feet away, victims unarmed, victims just going about their day. They had done nothing wrong. After pulling the gun, they had enough time to figure out what was going on, to try to run away, and he shot both victims in a close distance in the back shooting them multiple times." Additionally, defendant had previously demonstrated the ability to disobey direct orders from higher-ups in his gang. Yet despite that ability, he still made the conscious choice to kill two innocent, unarmed, young men, shooting at their turned backs even as they retreated. 20 years of rehabilitative progress do not change those facts. The trial court was within its discretion to balance those facts with the evidence of rehabilitation by sentencing defendant to an aggregate sentence of 80 years—29 years less than defendant's previous sentence.

¶ 29    In sum, the trial court did not abuse its discretion in resentencing defendant. It thoughtfully and carefully considered all factors in mitigation and aggravation and constructed an appropriate sentence.

¶ 30                                    III. CONCLUSION

¶ 31    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 32    Affirmed.